*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JACQUELINE CHESHER et al.,

        *Plaintiffs-Appellees,*

    *v.*

TOM NEYER et al.,

        *Defendants,*

CARL L. PARROTT, JR., M.D. (05-4256); JONATHAN TOBIAS, M.D. (05-4257); GARY UTZ, M.D. (05-4273); TERRY DALY (05-4274); ROBERT PFALZGRAF, M.D.(05-4275); HAMILTON COUNTY, OHIO (05-4332),

        *Defendants-Appellants.*

> Nos. 05-4256/4257/
> 4273/4274/4275/4332

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 01-00566—S. Arthur Spiegel, Sr. District Judge.

Argued: December 5, 2006

Decided and Filed: February 16, 2007

Before: BATCHELDER, GILMAN, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Lawrence E. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, Glenn V. Whitaker, VORYS, SATER, SEYMOUR & PEASE, Cincinnati, Ohio, Jamie M. Ramsey, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio, for Appellants. Alphonse A. Gerhardstein, LAUFMAN & GERHARDSTEIN, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Lawrence E. Barbiere, SCHROEDER, MAUNDRELL, BARBIERE & POWERS, Cincinnati, Ohio, Glenn V. Whitaker, Victor A. Walton, Jr., Michael L. Rich, VORYS, SATER, SEYMOUR & PEASE, Cincinnati, Ohio, Jamie M. Ramsey, Louis Francis Gilligan, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio, for Appellants. Alphonse A. Gerhardstein, LAUFMAN & GERHARDSTEIN, Cincinnati, Ohio, Stanley M. Chesley, Paul M. De Marco, Renee A. Infante, WAITE, SCHNEIDER, BAYLESS & CHESLEY, Cincinnati, Ohio, for Appellees.

      GILMAN, J., delivered the opinion of the court, in which BATCHELDER, J., joined. ROGERS, J. (p. 20), delivered a separate opinion concurring in part and dissenting in part.

1

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  In 2001, Jaqueline Chesher and other named plaintiffs initiated a class action lawsuit against Hamilton County, several individuals employed at the Hamilton County Morgue, and Thomas Condon, a private photographer.  Chesher's claims stem from an "art project" that Condon undertook at the Morgue in which he photographed dead bodies without the knowledge or consent of the decedents' relatives.  The employee defendants allegedly engaged in a civil conspiracy and inflicted emotional distress on the class members by facilitating the project and later covering up their involvement.  Asserting statutory immunity under Ohio law, the employee defendants moved for summary judgment.  The district court denied their motions.

Subsequently, the employee defendants filed these interlocutory appeals from the district court's judgment.  Hamilton County also appealed, arguing that the district court improperly denied the County summary judgment regarding Chesher's negligent-infliction-of-emotional-distress claim, even though that issue was not before the court.  For the reasons set forth below, we **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

**A.     Factual background**

The substance of Chesher's claims arises from the heavily publicized discovery in January of 2001 of at least 317 allegedly improper photographs of dead bodies taken at the Hamilton County Morgue.  Taken between August of 2000 and mid-January of 2001, the photographs depict the bodies in unnatural "artistic" poses, often employing props for effect.  In a prior appeal that resolved a disputed issue of attorney-client privilege, this court referred to the factual circumstances as "appalling," and then-Coroner Dr. Carl Parrott has characterized the photographs as "deplorable." *Chesher v. Allen*, 122 Fed. App'x 184, 185 (6th Cir. 2005).  A criminal investigation and trial revealed that Condon had taken the vast majority of the offending photographs.  Also found at Condon's studio were a small number of questionable photographs taken by Dr. Jonathan Tobias, a pathology fellow employed by the County Coroner's Office.  Chesher alleges that the County defendants' involvement in Condon's actions, either through negligence, recklessness, or a cover-up effort, substantiates the civil claims asserted in this action.

### 1.      *Condon's introduction to Parrott and the Coroner's Office*

At the time the offending photographs were taken, Parrott was the Hamilton County coroner.  He testified in his deposition that, as coroner, he was the "top policy maker with respect to conducting any duties and faithfully preserving the integrity of those bodies while they are in the County's custody."  In 1999, Parrott began to explore the idea of creating an autopsy-training video for use by hospitals and law enforcement.  He instructed Terry Daly, his administrative aide, to set up a meeting for the purpose of discussing this video project.

Daly invited Condon and film producer Ernie Waits, Jr. to meet with himself, Parrott, and Parrott's administrative assistant Rhonda Gros at the Coroner's Office in 1999.  At that first meeting, Parrott explained to the group his idea for the training video and noted that he would seek legal counsel concerning issues of consent for the proposed video footage.  As part of the instructional video or as a separate project, Parrott intended to showcase a rare neck-dissection procedure in which his office had developed a particular expertise.

Condon and Waits next met with representatives from the Coroner's Office in June or July of 2000. This meeting included the same attendees, except that Deputy Chief Coroner Dr. Robert Pfalzgraf attended in place of Gros. Daly and Waits testified in their depositions that, at either the first or second meeting, Condon mentioned that he would like to pursue an independent project of his own involving artistic photographs of dead bodies, and that he had brought along with him one or more books of such photographs to illustrate his intentions. Chesher alleges that one of these books was authored by Germano Celant, an Italian art critic, and included photographs of cadavers posed with props similar to the offending photographs later taken by Condon.

According to Daly, Parrott evinced little reaction to Condon's proposed art project, but stated something to the effect that "we can consider it" and that he had "seen things like that before." An audiotaped conversation between Daly and Staff Pathologist Dr. Gary Utz that took place later, after the discovery of the photographs, similarly refers to Condon's art-project proposal at the meeting:

> Utz:   Didn't he [Parrott] know that Thomas [Condon] had an interest in doing this stuff?
> Daly:  We all did . . . verified that that goddamn book was in that first fucking meeting and everybody in that goddamn room looked at it.

(Omission in original.) Parrott claimed in his deposition that he could not remember whether Condon explained his individual project or exhibited any artistic books at the meetings, but added "I can't say that it was not [discussed]."

By the time of this second meeting, Parrott had solicited and received a legal opinion from the Hamilton County Prosecutor's Office advising him that he could produce the training video without obtaining the consent of the families of the autopsy subjects so long as the video was not used for commercial purposes. The opinion further advised Parrott to take steps to obscure identifying features of any bodies filmed. Although Parrott discussed this advice at the meeting, he stated in his deposition that he instructed Daly and Pfalzgraf to allow Condon and Waits to "do whatever they needed to do to determine what resources would be needed" to produce a cost estimate for the proposed instructional film. As preliminary work began on the training-video project, Parrott assigned Daly and Pfalzgraf specific roles. Daly was to be in charge of the logistics, and Pfalzgraf was to perform the autopsy procedures to be filmed.

Condon stated at his sentencing hearing that he provided Daly with a list of "Symbolic Objects To Be Used And Their Intended Meanings" in regard to his art project. Daly, however, denies ever having seen such a list.

### 2.    *Condon begins photography at the Morgue*

Chesher claims that, in the course of preparing to produce the instructional film, Condon was essentially given free rein to pursue his own art project using the Morgue and the bodies housed there. Security at the Morgue during this time consisted primarily of what Parrott characterized as "an internal security system based entirely on trust."

The Morgue is located on the first floor of the Coroner's Office. Two coolers house the bodies, and County staff perform the autopsies in a suite adjacent to the coolers. During the relevant time period, the door to the autopsy suite was secured with a keypad lock that prevented entry by anyone without a proper code. The cooler itself, however, which also provided access to the autopsy suite, was unlocked. Coroner's Office staff members were also aware that the characters "*7" could be entered on the keypad by anyone as a "shortcut" code. Condon used that code to enter the autopsy suite. Morgue employees stated that they received no training on who should be permitted to enter the Morgue.

In August of 2000, Daly explained to both Pfalzgraf and Tobias that Condon would be around the Morgue taking photographs for the training-video project. Pfalzgraf, Tobias, and Utz subsequently permitted Condon, beginning on August 16, to observe autopsies that they performed. Although standard practice required outside persons observing an autopsy to sign a "view sheet," Condon did not sign in for the autopsies that he observed on August 16, or for those that he observed and photographed during later visits.

Daly prepared a short outline of a script for the proposed video after the initial August 16 visit by Condon and Waits. Several weeks later, Condon and Waits provided Parrott with an estimate of $10,000 to produce the instructional video. Parrott, according to his deposition testimony, determined that the Coroner's Office could not afford the project based on this bid. In addition, Parrott had in the meantime obtained an alternate training video at a National Association of Medical Examiners meeting that lessened the need to produce his own.

Parrott said in his deposition that he decided not to proceed with the video project at that point, but he conceded that he did not "recall giving [Daly], you know, a specific statement that it's over, it's done and history." Pfalzgraf similarly said that he "never knew of the project being cancelled." Parrott could not recall precisely when he decided to cancel the project, but indicated in his deposition testimony that his County Coroner campaign for the November 7, 2000 election was underway at the time. He asserts that his involvement with Condon ceased at that point, but Chesher alleges otherwise. She claims that Condon later received and distributed yard signs supporting Parrott's candidacy during his reelection campaign. According to Chesher, Condon also sent Parrott a Christmas card and sent the Coroner's Office staff a spiral-sliced ham for their holiday party.

### 3.      *Project cancelled but offending photography continues*

Despite Parrott's deposition testimony that the project was cancelled, the Coroner's Office staff continued to permit Condon access to the Morgue and to the bodies housed there through 2000 and into January of 2001. Photographs later discovered in Condon's studio reveal that he had observed, and often arranged with props, numerous bodies at the Morgue during that time. Condon photographed bodies both in the autopsy suite and in the cooler. The bodies photographed included those on whom autopsies had been performed by Pfalzgraf, Tobias, and Utz. Although the employee defendants assert that Condon visited the Morgue no more than five times in all, the district court found that Chesher had "highlighted instances which reasonably could lead one to find that Condon frequented the morgue at least eleven times." During the time frame in question, 532 bodies were housed at the Morgue.

Several examples serve to illustrate the nature of the photographs at issue. One involved the body of John Brady, whose autopsy was performed by Pfalzgraf. Brady was shown on the autopsy table with props that included a dollhouse ladder placed against his open skull. Photographs of Thomas Senteney, whose autopsy was performed by Utz, depict his body with a cloth scarf placed over his eyes and an egg displayed nearby. Utz also performed the autopsy of Christina Folchi, who was photographed with sheet music placed on her body and a snail near her groin area as well as other items pressed into her hand and mouth. The photographs indicate Condon's presence at these and other autopsies. Autopsy view sheets for the photographed subjects, however, do not reflect his presence. According to Chesher, several of the offending photographs depict the hands of Morgue employees as they were performing the autopsies.

Chesher alleges that although Condon showed both Tobias and Utz samples of the offending photographs during this time, they continued to permit Condon to visit the Morgue and take photographs. In Tobias's case, he acknowledged that Condon showed him some of the offending propped photographs, including the Brady photo, first in September of 2000 and then again in

January of 2001. According to Tobias, he trusted Condon to obtain proper authorization from Parrott for the taking of such photographs.

Tobias kept in personal contact with Condon and met with him two or three more times, including one event at a local bar. On December 6, 2000, Tobias met with Condon during Senteney's autopsy, but during the course of the meeting "left [Condon] alone in the morgue" with the body. Condon used the opportunity to take additional offending photographs, which Tobias claims was without his knowledge. When Condon again showed Tobias some of the offending photographs in January of 2001, Tobias instructed Condon to show his pictures to Utz and get permission before continuing his project. Tobias said that Condon complied and showed some of his propped photographs and an art book to Utz, to which Utz allegedly responded "[o]h, that's kind of cool."

Utz similarly testified in his deposition that, sometime in early January of 2001, he saw several of Condon's propped photographs, including an autopsy photograph showing Utz's hands. One of the propped photographs that Condon showed to Utz was that of Brady with the dollhouse ladder leaning against his open skull.

In addition to permitting Condon to take photographs at the Morgue, Tobias began using Condon's studio for printing some of his own offending photographs, including several from the death scene of a woman named Toby Malakoff. Tobias used a Morgue camera to take photographs of her body first as he found it at the scene, and then after he had turned the body over and lifted her shirt to reveal her breasts. Parrott testified in his deposition that Tobias's photographs "shouldn't have been at a commercial photographer's studio" such as Condon's. He added that Tobias's photographs of Malakoff could be interpreted as "souvenirs or, you know, an effort at art" and that he was not aware of any forensic purpose served by them. Tobias, on the other hand, maintains that the photographs were forensically necessary and that he developed them at Condon's studio because he believed Condon to be trusted by the Coroner's Office.

### 4.     *Discovery of the photographs, prosecution, and the alleged cover-up*

On January 8, 2001, Robin Imaging Services, a Cincinnati photo-developing studio, contacted the Cincinnati Police Department's vice squad regarding some unusual photographs in its possession that indicated the possible abuse of corpses. Sergeant Lovett of the vice squad dispatched officers to investigate the call. The officers obtained the photographs from Robin Imaging and learned that Condon was the customer who had dropped them off. A search warrant was then executed for Condon's personal photography studio. There the police discovered numerous other corpse photographs as well as a sheet of "symbols" listing props that appeared in the photographs. This initial investigation led police to the conclusion that the photographs were taken at the Hamilton County Morgue, so Lovett began contacting Morgue personnel. Lovett interviewed all of the Morgue staff members before handing the investigation over to the County Prosecutor's Office. Ultimately, the prosecutor charged Condon with eight counts of gross abuse of a corpse. *See State v. Condon*, 808 N.E.2d 912, 913 (Ohio Ct. App. 2004).

The prosecutor also determined that Tobias had taken a personal interest in Condon's work and had conducted at least two of the autopsies during which Condon took offending photographs. *See State v. Tobias*, No. C-020261, 2003 WL 21034555, at *6 (Ohio Ct. App. May 9, 2003). Tobias was the only Coroner's Office staff member criminally charged, but his conviction was later overturned on appeal due to insufficient evidence to prove beyond a reasonable doubt that he had taken affirmative action to aid or abet Condon's corpse abuse. *Id.* at *7.

Chesher alleges that, upon discovery of the photographs, the County defendants and other County officials began a concerted effort to cover up and minimize any official involvement in Condon's art project. First, Chesher claims that County authorities suspended only Tobias, the

lowest-level physician in the Coroner's Office, following the discovery of the photographs. According to Tobias, Gros informed him that he was being suspended in order to "protect the county," and Tobias noted that "there was already speculation about a civil lawsuit." Tobias contends that, just after the Morgue photograph scandal became public, Parrott had assured him that "I know you did nothing wrong." According to Pfalzgraf, Parrott later stated that "his hand were tied" regarding Tobias's suspension, allegedly because the Prosecutor's Office had insisted on the measure. Furthermore, Tobias claims that Parrot told him that "they needed to protect the county, and that he couldn't talk to me because I knew that he knew about the art books."

Chesher alleges that the second step of the cover-up consisted of "block[ing] public access" to facts that demonstrated the involvement of County officials other than Tobias. She claims that in order to limit the County's exposure, the Prosecutor's Office purposefully withheld evidence from the criminal trial of Condon and Tobias, such as the taped conversation between Daly and Utz quoted above. Prosecutors similarly did not introduce into evidence the opinion letter that Parrott had obtained from the Prosecutor's Office advising him that he could go forward with the autopsy video project without obtaining the consent of the decedents' families.

Chesher also relies on a letter that Hamilton County Commissioner Todd Portune sent to the presiding judge during the criminal trial in June of 2002, suggesting that a cover-up may have occurred. In the letter, Portune asserted that the Coroner's Office personnel bore responsibility for the scandal. Portune also relayed to the judge a sworn statement from Condon's wife, Kelly Blank, in which she explains that Utz told her that prosecutors "came into the morgue and 'openly threatened people' as to what to say and how to testify." Blank claimed that Utz agreed that "there was a purposeful plan from the beginning to convict Condon and Tobias and protect higher-ranking officials."

### 5.    *Alleged conspiratorial acts in 2003*

Chesher's statement of the facts on appeal largely mirrors what she presented in her brief in opposition to the defendants' motions for summary judgment before the district court. Significantly, however, in Chesher's factual recitation in support of her conspiracy claim before the district court, she alleged conspiratorial events extending into May, June, and July of 2003. The dates of these acts in 2003 are relevant to the jurisdictional question addressed in Part III below. Chesher alleged that, in May of 2003, a member of the Prosecutor's Office demanded a "secret Sunday session with Tobias" shortly before his deposition. She asserted that this session amounted to an interrogation and was improperly concealed.

Furthermore, Chesher alleged that a representative of the Prosecutor's Office was present at Tobias's deposition on May 14, 2003 and June 25, 2003. She claimed that between those dates, the Prosecutor's Office sent Tobias a letter stating that the County had decided to provide him with counsel for his civil trial. Following the second day of Tobias's deposition, however, in which he testified that his suspension was merely an effort to "protect the county," the Prosecutor's Office allegedly sent him a second letter dated July 11, 2003 which "sharply attacked" his testimony and reminded him that provision for his defense in the civil case could be withdrawn. In the Joint Final Pretrial Order before the district court, Chesher identified these and other communications dated in May, June, and July of 2003. Counsel for Chesher also referred to these alleged acts of conspiracy before the district court in the Joint Final Pretrial Conference on October 6, 2005.

The portion of Chesher's brief on appeal that describes the alleged conspiracy omits any reference to the events occurring in 2003. Instead, Chesher now contends that the alleged cover-up activities concluded in 2002 "at the latest." She continues to assert, however, that the alleged conspiracy and cover-up "significantly compounded the injury to the plaintiffs."

## B.       Procedural background

The class action complaint in this litigation was initially filed in November of 2001. In March of 2002, Chesher filed an amended complaint, naming as defendants Hamilton County, Condon, Daly, Gros, Parrott, Pfalzgraf, Tobias, and Utz. The amended complaint asserted federal claims under 42 U.S.C. § 1983 and state-law claims for negligent and intentional infliction of emotional distress, as well as for a civil conspiracy to inflict such harm.

In May of 2003, the district court issued an order that conditionally certified the class under Rule 23(a) of the Federal Rules of Civil Procedure. Subsequently, in response to a motion by the defendants to decertify the class, the court split the class into two subclasses. Subclass One consists of

> [t]he family members of all the deceased whose remains, for other than a proper government purpose, were *photographed* by Thomas Condon or Jonathan Tobias, M.D. or one of their agents between August 2000 and January 2001 (inclusive) while such bodies were in custody of the Hamilton County Coroner's office, without permission from the legal representatives of the deceased.

(Emphasis added.) Subclass Two consists of a corresponding group of family members of the deceased whose remains were *not* photographed, but were instead only "accessed, viewed or manipulated" by Condon or Tobias.

In December of 2004, the district court granted the County's motion to dismiss Chesher's claims for intentional infliction of emotion distress and for civil conspiracy, concluding that the County was immune from liability for the intentional tort claims. But the court held that the claim against the County for negligent infliction of emotional distress remained viable under an exception to the County's statutory immunity. That order has not been appealed.

Most recently, in September of 2005, the district court denied in part the various defendants' motions for summary judgment. Those motions were based in part on state-law immunity grounds, but the court found that the employee defendants were not entitled to immunity under Ohio law. The court did dismiss, however, all of the claims against defendant Gros based on the lack of evidence supporting her involvement. In addition, the court reminded the County that the state-law intentional tort claims against it had already been dismissed. The County did not move for summary judgment based on state-law immunity regarding the negligence claim still pending against it.

Daly, Parrott, Pfalzgraf, Tobias, and Utz, as the remaining employee defendants, timely filed the present interlocutory appeal from the district court's denial of their motions for summary judgment. Hamilton County joined the appeal, contending that the district court's September 2005 order improperly denied the County summary judgment based on statutory immunity regarding Chesher's state-law negligence claims, despite the fact that the County never moved for summary judgment on that ground. The federal § 1983 claims have been dismissed with respect to all of the defendants except the County, and that claim is not at issue in this appeal.

## II.  JURISDICTION

An order denying summary judgment is not ordinarily a final, appealable decision. *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002). The collateral order doctrine, however, provides that a district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291 "'to the extent that it turns on an issue of law.'" *Bradley v. City of Ferndale*, 148 F. App'x 499, 504 (6th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). In the context of a diversity case or a federal-question action involving pendent state-law claims, the question of whether an interlocutory order denying immunity under state law is appealable turns on the nature

of the immunity at issue. *Id*. at 511 (citing *Mitchell*, 472 U.S. 511 and *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). An order denying statutory immunity is immediately appealable only if the state law provides immunity from suit, as opposed to immunity simply from liability. *See Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 605 (6th Cir. 2005).

Prior to 2003, Ohio's immunity statutes, codified in Chapter 2744 of the Ohio Revised Code, provided immunity from liability only. An interim order denying immunity under that section was thus not immediately appealable. *See, e.g.*, *id*. (holding that a district court's denial of immunity under § 2744.03 regarding claims that accrued in 2000 did not support jurisdiction for an interlocutory appeal because the statute provided immunity from liability only).

Ohio amended § 2744.02 in 2003, however, to provide that "[a]n order that denies . . . the benefit of an alleged immunity from liability as provided in this chapter or any other provision of the law is a final order." Ohio Rev. Code Ann. § 2744.02(C). Because Ohio Rev. Code Ann. § 2505.03(A) provides that every final order may be appealed, Ohio now clearly allows for an immediate appeal from the denial of immunity under Chapter 2744. This effectively provides political officials and subdivisions with immunity from suit, and thus warrants interlocutory appellate jurisdiction under the collateral order doctrine. *See Bradley*, 148 F. App'x at 512 (determining that an analogous change in Michigan law making a denial of statutory immunity a final, appealable order created jurisdiction for an interlocutory appeal pursuant to the collateral order doctrine).

Ohio courts have determined, however, that the amendment making a denial of immunity immediately appealable applies only prospectively to claims accruing after the effective date of the amendment. *See Jackson v. Columbus*, 804 N.E.2d 1016, 1019-1020 (Ohio Ct. App. 2004). The amendment became effective on April 9, 2003. Our jurisdiction thus turns on whether the claims to which the denial of immunity applied accrued on or after that date. *See id.*

## A.     Jurisdiction with respect to the infliction-of-emotional-distress claims

Chesher asserts that her claims must have arisen prior to April 9, 2003 because the latest amended complaint in this action was filed in 2002. She therefore argues that this court lacks jurisdiction over the present interlocutory appeals. Causes of action for emotional distress, however, accrue not when the underlying activity occurs, but rather when the plaintiff suffers emotionally by learning of it. *See, e.g.*, *Biro v. Hartman Funeral Home*, 669 N.E.2d 65, 68 (Ohio Ct. App. 1995) (holding that an action for intentional infliction of emotional distress accrues "at the time the injury is incurred and the emotional impact is felt"). Class plaintiffs in this case include not only those families whose deceased relatives were photographed by Condon (Subclass One), but also all families whose relatives were housed in the Morgue during the time the offending photographs were taken and whose bodies thus may have been "accessed, viewed, or manipulated" by Condon (Subclass Two). According to their deposition testimony, many, if not all of the members of Subclass Two did not discover their injury until contacted by Chesher's counsel in 2004.

Chesher argues that, although the claims of some class members did not accrue until after April 9, 2003, the class representatives' claims accrued before that date. To hold that the claims accrued after that date, Chesher contends, would "let the tail wag the dog." But the defendants point out that even the chosen representatives of Subclass Two did not learn of their claims until after the effective date, and that the vast majority of that class is similarly situated. This would mean that we have jurisdiction over the majority of the class's claims.

Our sister circuits have recognized the problems inherent in ascertaining when claims accrue on a class-wide basis. *See, e.g., Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311 (4th Cir. 2006) (upholding the denial of class certification where a statute-of-limitations defense required an

individualized examination of each plaintiff's knowledge to determine when their claims accrued). The present case, however, does not involve a statute-of-limitations defense as in *Thorn*. Because we have interlocutory jurisdiction over the majority of the class's emotional-distress claims and because all plaintiffs are similarly situated for purposes of resolving the immunity issues presented, we can properly take up the question presented. *Cf. Tucker v. City of Richmond*, 388 F.3d 216, 224 (6th Cir. 2004) (addressing, in the context of an interlocutory qualified-immunity appeal, related but unappealable issues that were "inextricably intertwined" with the appealable issues).

## B.     Jurisdiction with respect to the conspiracy claims

Chesher's argument that we lack jurisdiction over the appeal with respect to her conspiracy claim belies her own expansive allegations regarding the misconduct at issue. Chesher successfully argued before the district court that the employee defendants had engaged in a continuing civil conspiracy (1) with one another and Condon in 2000 and 2001 to permit Condon to undertake his art project, and (2) with the County Prosecutor's Office to cover up their misconduct from 2001 until at least July of 2003.

Chesher attempts to distance herself from these arguments on appeal by shifting her factual allegations. She omits on appeal any reference to the overt acts allegedly committed in 2003. In addition, in the context of her jurisdictional argument, Chesher asserts that the alleged conspiracy relates only to the offending photographs, with no reference to the continuing cover-up. Chesher now questions "where in the record is there evidence that [the defendants] engaged in cover-up activities after April 9, 2003?"

The answer to her question lies in her successful opposition to the defendants' motions for summary judgment on the conspiracy claim, where she alleged that Tobias and others in the Coroner's Office engaged in a cover-up with the County prosecutors that extended beyond April 9, 2003. In *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998), the Ohio Supreme Court cited with approval Am. Jur. 2d, *Conspiracy*, §§ 50-73 in defining Ohio civil conspiracy law. Section 65 provides, with regard to the accrual of civil conspiracy claims, as follows:

> In determining when the period of limitations begins to run, the statute does not begin from the date of the conspiratorial agreement, but from the occurrence of damage pursuant to the conspiracy. However, under various decisions, the limitations period may run from the date of the last overt act done in furtherance of the conspiracy, or from the last overt act causing damage to the plaintiff, or from the date of each overt act causing damage.

16 Am Jur. 2d, *Conspiracy* § 65 (2006) (footnotes omitted); *cf. State v. Tolliver*, 765 N.E.2d 894, 899-900 (Ohio Ct. App. 2001) (holding in the context of a criminal conspiracy that the statute of limitations begins to run with the "last overt act in furtherance of the conspiracy").

Using any of the above measuring points, Chesher's conspiracy claim alleging acts in May, June, and July of 2003 accrued after April 9, 2003. Ohio law also establishes that acts of coconspirators are attributable to one another. *Williams*, 700 N.E.2d at 868. We therefore conclude that Chesher's allegations of conspiratorial acts that allegedly took place between May and July of 2003 acted as a de facto amendment to her complaint and establish our jurisdiction over the employee-defendants' interlocutory appeals.

Chesher's argument that her conspiracy claim accrued prior to April 9, 2003 is also untenable in light of our determination of when her infliction-of-emotional-distress claim accrued. Ohio does not recognize conspiracy as an independent tort. *See Orbit Elecs., Inc. v. Helm Instrument Co.*, 855 N.E.2d 91, 100 (Ohio Ct. App. 2006) ("An action for civil conspiracy cannot be maintained unless an underlying unlawful act is committed."); *Putka v. First Catholic Slovak Union*, 600 N.E.2d 797,

803 (Ohio Ct. App. 1991) (noting that an independent claim of "conspiracy is not a recognized tort under Ohio law") (quotation marks omitted).  Here, where the underlying infliction of emotional distress did not accrue until after April 9, 2003, it would be incongruous to hold that the conspiracy claim premised on those tortious acts accrued earlier.

## III.  ANALYSIS

### A.     Standard of review

We review de novo a district court's denial of summary judgment based on immunity from suit.  *Int'l Union v. Cummins, Inc*., 434 F.3d 478, 483 (6th Cir. 2006).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).

### B.     Ohio's immunity statute

Ohio codified its governmental-immunity law in Chapter 2744 of the Ohio Revised Code.  Section 2744.02 sets forth a grant of immunity to the state and its political subdivisions, and lays out specific exceptions.  The following section, 2744.03, provides, among other things, similar immunity and exceptions for state or state-subdivision employees.  Both sections of Ohio's immunity law are implicated in the present appeal.

#### 1.     *The County's immunity under the statute*

Hamilton County appeals what it describes as the district court's sua sponte denial of immunity under § 2744.02(B)(4).  As a political subdivision of the state defined under § 2744.01(F), the County is entitled to a broad grant of immunity from liability for "any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  Ohio Rev. Code Ann. § 2744.02(A)(1).  That broad grant of immunity, however, is subject to the exceptions set forth in § 2744.02(B).  One of those exceptions, § 2744.02(B)(4), revokes immunity "where an injury resulting from the negligence of an employee of a political subdivision occurs within or on the grounds of buildings that are used in connection with the performance of governmental functions."  *Hubbard v. Canton Bd. of Educ*., 780 N.E.2d 543, 547 (Ohio 2002) (defining the scope of § 2744.02(B)(4)).  The County's argument on appeal centers on the applicability of this exception.

#### 2.     *The employee-defendants' immunity under the statute*

Section 2744.03 grants immunity to employees of political subdivisions acting within the scope of their employment, but provides that this immunity is subject to specific exceptions.  Ohio Rev. Code Ann. § 2744.03(A)(6).  Two listed exceptions are relevant to the present appeals.  First, § 2744.03(A)(6)(a) provides that an employee is not immune if his or her "acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities."  The other applicable exception is § 2744.03(A)(6)(b), which states that individual employee immunity does not apply if "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

Chapter 2744 does not further define the type of employee acts that fall "manifestly outside the scope of employment" under § 2744.03(A)(6)(a).  The Ohio state courts, however, have

generally drawn from agency-law principles to hold that "[c]onduct is within the scope of employment if it is initiated, in part, to further or promote the master's business." *Martin v. Cent. Ohio Transit Auth.*, 590 N.E.2d 411, 417 (Ohio Ct. App. 1990). But "[a]n employee's wrongful act, even if it is unnecessary, unjustified, excessive or improper, does not automatically take the act manifestly outside the scope of employment." *Jackson v. McDonald*, 760 N.E.2d 24, 28 (Ohio Ct. App. 2001). The court in *Jackson* held that "it is only where the acts of the state employees are motivated by actual malice or other situations giving rise to punitive damages that their conduct may be outside the scope of their state employment." *Id.* (brackets omitted).

Section 2744.03(A)(6)(b) differs from subpart (a) in that it explicitly focuses on the employee's state of mind rather than the employee-employer relationship. Most relevant for the purposes of this appeal is the exception for acts or omissions that were committed "in a wanton or reckless manner." Ohio Rev. Code Ann. § 2744.03(A)(6)(b). Under Ohio law, wanton and reckless conduct is defined as

> perversely disregarding a known risk, or acting or intentionally failing to act in contravention of a duty, knowing or having reason to know of facts which would lead a reasonable person to realize such conduct creates an unreasonable risk of harm substantially greater than the risk necessary to make the conduct negligent.

*Webb v. Edwards*, 845 N.E.2d 530, 536 (Ohio Ct. App. 2005).

Ohio's immunity statute draws no distinction between suits against an individual government employee in his official as opposed to his personal capacity. The Ohio Court of Appeals has held that an action against an officer in his "official capacity" is simply another way of pleading an action against the governmental entity itself. *Norwell v. City of Cincinnati*, 729 N.E.2d 1223, 1232 (Ohio Ct. App. 1999) (citing *Monell v. New York Dep't Soc. Servs.*, 436 U.S. 658, 690 (1978)). If official-capacity claims are nothing more than claims against the county, then it would be appropriate to dismiss the official capacity claims against the employee defendants if such claims have been dismissed against the county. *See J & J Schlaegel, Inc. v. Bd. of Trustees of Union Twp.*, Nos. 2005-CA-31/2005-CA-34, 2006 WL 1575036, at *10 (Ohio Ct. App. June 9, 2006); *Kammeyer v. City of Sharonville*, 311 F. Supp. 2d 653, 661 (S.D. Ohio 2003). Whether the defendants are liable as individuals thus turns on the availability of statutory immunity as defined in Chapter 2744. For each employee defendant, we must determine whether any of the immunity exceptions under § 2744.03(A)(6) apply.

## C.     The County's argument

Hamilton County's argument in this appeal presents an unusual issue. As outlined in the procedural history, the County originally moved to dismiss Chesher's claims based on immunity under Chapter 2744. The district court granted that motion as to the claims against the County for the intentional infliction of emotional distress and for civil conspiracy, but denied the motion as to Chesher's negligence claims in an order dated December 17, 2004. Its denial of immunity for the negligence claim was based on the exception to immunity found in § 2744.02(B)(4), which precludes immunity for acts of negligence that occur within or on the grounds of buildings used in connection with the performance of governmental functions. *See Hubbard*, 780 N.E.2d at 547. The County did not then and does not now appeal that order.

Moreover, as the County itself emphasizes, it has never moved for summary judgment on the remaining negligence claim based on statutory immunity. Logic dictates, then, that the negligence claim remains pending against the County. The County argues on appeal, however, that the district court erred by sua sponte denying the County summary judgment on the basis of statutory immunity when the court quoted from a portion of its prior December 2004 order in its

more recent order issued in September of 2005. But that more recent order primarily concerned the employee-defendants' motions for summary judgment and the County defendants' motions for summary judgment based on grounds other than statutory immunity.

Because the County did not move for summary judgment on Chesher's negligence claim, the district court had no occasion to reconsider the earlier ruling on the County's motion to dismiss. The district court's quotation of its earlier order, when viewed in context, simply served to clarify to the multiple parties involved in this complex case which claims remained pending and which claims the court had earlier dismissed. Contrary to the County's argument, the district court did not sua sponte deny the County summary judgment on grounds that the County itself never asserted.

We therefore decline to address the County's immunity arguments at the present time. *See Wright v. Holbrook*, 794 F.2d 1152, 1157 (6th Cir. 1986) ("[T]he general rule is that this court will not consider issues not raised in the district court."). The County remains free, of course, to move for summary judgment on Chesher's negligence claim upon remand of this case to the district court.

**D.     The employee-defendants' claims of immunity**

Employee-defendants Daly, Parrott, Pfalzgraf, Tobias, and Utz appeal the district court's order denying their respective motions for summary judgment on the basis of immunity under Chapter 2744 of the Ohio Revised Code. The district court only briefly addressed their immunity defense, again quoting from its December 2004 order:

> An exception found in section 2744.03 of the Ohio Revised Code, serves to eliminate the immunity of the individual defendants—specifically sub-sections 6(a & b) . . . .
>
> The actions of the individual County employees, if true, clearly were manifestly outside the scope of their employment or official responsibilities. As such, the individual County employees, named as Defendants in this case can not claim immunity under Chapter 2744.

*Chesher v. Neyer*, 392 F. Supp. 2d 939, 962 (citations, brackets, and quotation marks omitted). The court went on to explain that "[a]s the above quotation from the Court's earlier Order clearly states, the Court relied upon the exceptions found at . . . 2744.03[A](6)(a & b) to find the . . . individual County Defendants liable for IIED [intentional infliction of emotional distress], NIED [negligent infliction of emotional distress], and Civil Conspiracy." (Bracketed material added.) Thus, the court appeared to rest its denial of immunity on both the § 2744.03(A)(6)(a) exception for acts or omissions manifestly outside the scope of employment and the 2744.03(A)(6)(b) exception for reckless acts or omissions.

The likely explanation for the district court's brief treatment of the employee-defendants' motions for summary judgment based on statutory immunity is that the court had essentially already performed the requisite analysis earlier in its order. Just as the § 2744.03(A)(6)(b) exception requires wanton or reckless acts, the employee-defendants' motions for summary judgment as to the sufficiency of Chesher's evidence regarding the intentional infliction of emotional distress similarly required the court to consider whether each defendant acted in "an extreme and outrageous manner, thus recklessly causing Plaintiffs' emotional distress." *Chesher*, 392 F. Supp. 2d at 956. The court determined, after undertaking a lengthy analysis of the facts, that Chesher's allegations supported a finding of recklessness in the case of each defendant. Given those conclusions, § 2744.03(A)(6)(b) would preclude immunity for those same acts earlier found to be "reckless." For the reasons addressed below, however, we are of the opinion that the district court's application of the § 2744.03(A)(6)(a) exception for acts manifestly outside the scope of employment was erroneous.

Perhaps not surprisingly, no court has considered the applicability of Ohio's sovereign-immunity statute to facts sufficiently similar to Chesher's allegations to control the outcome in this case. Several recent cases, however, shed light on Ohio's interpretation of whether a defendant's acts are sufficiently egregious to sever the employer-employee relationship under § 2744.03(A)(6)(a) or to amount to recklessness under § 2744.03(A)(6)(b).

The Ohio Court of Appeals interpreted an immunity statute similar to Chapter 2744 in *Caruso v. State*, 737 N.E.2d 563 (Ohio Ct. App. 2000). In *Caruso*, the court considered whether, under Ohio Rev. Code Ann. § 9.86, an employee of the Ohio State University Medical Center could be held liable for berating and threatening to slap his administrative assistant. The court reviewed several cases in which Ohio courts had found that "arguably more egregious" conduct did not amount to recklessness, and reached the same conclusion in the case before it. *Caruso*, 737 N.E.2d at 568. Among the cases cited were *Fabrey v. McDonald Village Police Dep't*, 639 N.E.2d 31, 35-36 (Ohio 1994) (holding that a police chief's failure to maintain certain safety devices, which resulted in a police officer's injury when a prisoner set fire to his mattress, did not constitute wanton conduct); *Fuson v. Cincinnati*, 633 N.E.2d 612, 615 (Ohio Ct. App. 1993) (concluding that the failure of emergency medical personnel to transport an uncooperative injured person to a hospital did not rise to the level of wanton misconduct where the medics had checked for vital signs, no request for transport was made, and the medics had instructed the family to come to the hospital if the condition worsened); and *Jackson v. Butler City Bd. of Comm'rs*, 602 N.E.2d 363, 366-68 (Ohio Ct. App. 1991) (determining that a state agency's placement of a child with her father and its failure to check up on the child face-to-face prior to the child's being beaten to death was not reckless where the father was not a known placement risk that the agency disregarded).

The court in *Caruso* next addressed the question of whether the defendant's assault on his assistant fell "manifestly outside the scope of his employment." *Caruso*, 737 N.E.2d at 566. At the outset of its discussion, the court cited *Byrd v. Faber*, 565 N.E.2d 584 (Ohio 1991), for the principle that, in order for an intentional tort to be within the scope of employment, "the conduct giving rise to the tort must facilitate or promote the business for which the employee was employed or at least be calculated to do so." *Id.* at 567. The court determined, based on this principle, that whether immunity attached required an examination of the motives behind the alleged assault. *Id.* If the defendant's assault was merely to "gratify his own personal feelings of animosity and resentment," the court noted that he would not be entitled to immunity. *Id.* Ultimately, the court held that the defendant's outburst was instead motivated, at least in some "misguided" way, by his work-related concern for preventing needless interruptions by his assistant. *Id.* at 567-68. The assault thus fell within the scope of his employment and immunity attached. *Id.* This holding corresponds with the Ohio Supreme Court's statement that the scope of employment turns on the agency-law question of whether the conduct at issue was initially motivated by a desire to promote the master's business. *Martin*, 590 N.E.2d at 417.

More recently, in *Thompson v. Bagley*, No. 11-04-12, 2005 WL 940872 (Ohio Ct. App. Apr. 25, 2005), the Ohio Court of Appeals considered whether Drew Altimus, a physical education teacher, could be held liable for a child's drowning death in the school's swimming pool during a swimming class. Thompson alleged that Altimus had noticed the child floating face-down in the pool, but had simply assumed that the child was "only joking around." *Id.* at *1. Rather than rescuing the child himself, Altimus sent three different students in succession to attempt to pull the drowning student out of the water. *Id.* Finally, after the third student succeeded, Altimus began to perform CPR, but could not save the child. *Id.* The plaintiff produced an aquatic safety expert who testified that Altimus had failed to properly provide for the child's safety. *Id.* at *11. Ultimately, the court denied Altimus's motion for summary judgment based on statutory immunity, noting that "[w]hether such actions rises [sic] to the level of recklessness is normally a question to be determined by the trier of fact." *Id.; see also Fabrey*, 639 N.E.2d at 35 (noting that "the issue of wanton misconduct is normally a jury question").

With these principles of Ohio's statutory-immunity law in mind, we turn to the individual defendants' motions for summary judgment regarding Chesher's claim that they intentionally inflicted emotional distress on the class plaintiffs. A review of the employee-defendants' briefs in support of their motions reveals that they moved for summary judgment based on statutory immunity only as to Chesher's intentional-infliction-of-emotional-distress claims and her conspiracy claim. They specifically argued that "[i]n the absence of [the § 2744.03(a)(6) exceptions] . . . it is appropriate for this Court to grant summary judgment to the individual County Defendants . . . on Plaintiff's claims for intentional infliction of emotional distress and civil conspiracy." Because these defendants did not assert statutory immunity as a grounds for summary judgment regarding Chesher's *negligent*-infliction-of-emotional-distress claim, the issues associated with that claim are beyond the scope of this interlocutory appeal. Our treatment of the facts in the following sections views them most favorably to the plaintiffs, as required by the summary-judgment standard of review, but should not otherwise be taken as an acceptance of that version.

### 1.    *Daly*

Daly, like Parrott, attended the meetings at which Condon expressed an interest in undertaking an art project. Furthermore, Daly acknowledged in his deposition that it was his understanding that Condon's art project would involve taking photographs of dead bodies in posed positions. Condon also allegedly stated at his sentencing hearing that he provided Daly at some point with a list of "Symbolic Objects To Be Used And Their Intended Meanings" that is included in the record, although Daly denies ever having seen such a list. Finally, Parrott assigned Daly to be in charge of the logistics regarding the proposed film project.

Nothing in the record suggests that Daly acted outside the scope of his employment, particularly given Parrott's direct assignment for him to work with Condon. Subsection 2744.03(A)(6)(a) thus does not preclude Daly's immunity defense for reasons discussed more fully below in connection with Parrott. The record could, however, permit a jury finding that Daly "perversely disregard[ed] a known risk." *See Webb v. Edwards*, 845 N.E.2d 530, 536 (Ohio Ct. App. 2005). Although Daly was an administrative aide rather than a doctor at the Morgue, Parrott nonetheless assigned him a lead role in dealing with Condon. Daly's deposition testimony reflects that he had every reason to know that Condon intended to take the offending photographs, but "never warned anyone" despite his role as the project coordinator. We thus conclude that Daly is not entitled to statutory immunity because the record would permit a jury finding that his conduct falls within the § 2744.03(A)(6)(b) exception for wanton or reckless conduct.

### 2.    *Parrott*

Chesher alleges that Parrot, like the other employee defendants, both intentionally and negligently inflicted emotional distress on the class plaintiffs by facilitating Condon's access to the Morgue and by covering up the County's actions. In support of her claims, Chesher points out that Parrott attended the two introductory meetings with Condon prior to the preliminary work on the video project in August of 2000. Both Daly and Waits have stated that, during one of the meetings, Condon apprised Parrott of his intent to pursue an art project at the Morgue. Daly and Waits also testified in their depositions that Parrott made no objection to such a project at the time, noted that he "had seen things like that before," and indicated that he would consider it.

Contrary to the advice he received from the Prosecutor's Office, Parrott allegedly placed no limits on Condon and permitted him to take photographs without obscuring identifiable characteristics and without a plan to secure the photographs. As chief policymaker, Parrott was also in charge of the "trust-based" security policy at the Coroner's Office that permitted Condon to enter the facility even after Parrott claims to have cancelled the video project. Parrott does not

specifically recall giving his staff any notice that he had "cancelled" the project, and his staff does not recall receiving such a notice.

Chesher also identifies several instances of an ongoing relationship between Parrott and Condon during Condon's continued presence at the Coroner's Office from August of 2000 to January of 2001. During Parrott's reelection campaign, for example, Condon received and distributed yard signs supporting Parrott's candidacy. Condon also sent Parrott a Christmas card and sent the Coroner's Office a spiral-sliced ham for its holiday party. Chesher further alleges that following the discovery of the offending photographs in January of 2001, Parrott engaged in a conspiracy with the prosecutors and others to cover up the involvement of the County with Condon's activities.

Our first task is to decide whether the district court erred in determining that Parrott's conduct as summarized above fell manifestly outside the scope of his employment. We conclude that the record does not support the district court's ruling. To the contrary, Parrott sought out and directed Condon's work in an effort to create an instructional video that was a legitimate work-related goal. Like the defendant in *Caruso*, Parrott's actions in this regard were motivated, even if in a misguided manner, toward promoting a state purpose rather than strictly personal concerns. *Caruso*, 737 N.E.2d at 567. We thus conclude that Parrott's actions fell within the scope of his employment under § 2744.03(A)(6)(a).

This leaves the question of whether Parrott's actions were wanton or reckless under § 2744.03(A)(6)(b). The essence of Chesher's claim against Parrott is that he knew of Condon's desire to take artistic photographs and that Parrott's acts and omissions gave Condon free rein over a prolonged period of time to take such photographs, against the legal advice that Parrott had obtained from the Prosecutor's Office. Based on the existing record, a factfinder could reasonably determine that Condon's desire and ability to take artistic photographs amounted to a known risk. In the face of this danger, Parrott—the self-described top policymaker—permitted Condon to photograph Morgue subjects without restrictions or viable security measures in place, and failed to inform his staff that the video project had been cancelled.

We therefore affirm the district court's denial of Parrott's summary judgment motion regarding the intentional-infliction-of-emotional-distress claim because, as the court in *Thompson* concluded, a jury could find that Parrott's actions amounted to the disregard of a known risk "substantially greater than that necessary to make the conduct negligent." 2005 WL 940872, at *11. The Coroner's Office has a duty to hold bodies placed in its custody in a safe and respectful manner. Unlike the state agency in *Jackson* that was not on notice of the father's dangerous propensities when it gave him custody of his child, Parrott knew of the great risk that Condon's artistic photography posed in the most straightforward possible way: Condon allegedly told Parrott of his intent and showed him examples of similar photographs. *See* 602 N.E.2d at 366-367

We thus leave the determination of whether Parrott's actions amounted to wantonness or recklessness under § 2744.03(A)(6)(b) to a jury. *See Fabrey*, 639 N.E.2d at 35 (noting that "the issue of wanton misconduct is normally a jury question"). This conclusion is not at odds with the separate determination that Parrott's actions fell within the scope of his employment. *See Floyd v. Thomas*, No. CA99-07-016, 2000 WL 864990, at *5 (Ohio Ct. App. June 26, 2000) ("Although [the defendant] is correct in her statement that media statements are within the scope of her employment, the exception to immunity found in [Ohio Rev. Code Ann. § 2744.03(A)(6)(b)] for acts committed with malicious purpose, in bad faith and in a wanton and reckless manner would still apply.").

### 3.     *Pfalzgraf*

Pfalzgraf, like Parrott and Daly, attended the initial meetings with Condon at which the art project was discussed. As the deputy chief coroner, Pfalzgraf was assigned a supervisory role

regarding Condon's activities. The district court concluded that a jury could find that Pfalzgraf also acted recklessly because (1) Pfalzgraf was Tobias's supervisor and did not require Tobias to note Condon's presence at the autopsies he witnessed, and (2) Pfalzgraf allowed Condon to witness the autopsy of Brady, during which Condon photographed Brady with a dollhouse ladder propped against his open skull. In his defense, Pfalzgraf explained that he left the room at certain points during the Brady autopsy and that he never saw Condon using any props or taking any propped photographs. He also said that he never had any contact with Condon after the Brady autopsy on August 16, 2000.

There is sufficient evidence for a jury to conclude that Pfalzgraf, like Daly and Parrott, knew of Condon's plan to take the offending photographs due to Pfalzgraf's attendance at the initial meetings. Pfalzgraf also would have known of the instructions from the Prosecutor's Office to obscure identifiable features of any bodies photographed for the same reason. Once Parrott assigned Pfalzgraf to work with Condon, however, Pfalzgraf took no steps to ensure that any safeguards were followed and in fact testified that he left Condon alone in the autopsy suite. A factfinder could thus reasonably find that Pfalzgraf wantonly or recklessly permitted Condon to take offending photographs in the course of Brady's autopsy. We therefore conclude that Pfalzgraf's actions, although within the scope of his employment under § 2744.03(A)(6)(a), could be found by a jury to fall within the § 2744.03(A)(6)(b) exception for recklessness. As a result, we affirm the district court's denial of summary judgment as to Chesher's intentional-infliction-of-emotional-distress claim against Pfalzgraf.

### 4.     *Tobias*

Chesher alleges that Tobias, like Parrott, had knowledge of Condon's art project and yet continued to meet with Condon and permit him access to the Morgue and to Tobias's autopsy subjects. Tobias's own deposition testimony confirms that he likely had even greater knowledge of Condon's intentions than did Parrott because, on two separate occasions, Condon actually exhibited his offending photographs to Tobias. Nonetheless, Tobias did not object to Condon's continued access to the Morgue and to Tobias's autopsy subjects. In particular, Tobias acknowledged that even after seeing the offending photographs, he "left [Condon] alone in the morgue" in the course of conducting Senteney's autopsy.

Tobias not only permitted Condon to continue accessing the Morgue after viewing the offending photographs, but also began developing his own crime scene photographs at Condon's studio. Parrott questioned the propriety of these photographs by stating that they "simply shouldn't have been in a commercial photographer's studio." Although Tobias contends that his photographs were not improper and that Parrott permitted him to develop photographs at Condon's studio, Parrott disputes both of these assertions. In particular, he stated that Tobias's crime-scene photographs and his work at Condon's studio could be seen as collecting "souvenirs" or an attempt at art.

The record contains sufficient evidence to support a jury finding that Tobias acted recklessly under § 2744.03(A)(6)(b) with regard to both his own and Condon's photographs. He disregarded the great risk of harm posed by permitting Condon to continue the art project and by entrusting his own highly sensitive crime-scene photographs to Condon. Tobias asserts by way of defense that he consulted Parrott and Utz as his supervisors, that he warned Condon about taking the offending photographs, and that he permitted Condon to continue only because of what he perceived to be the approval of Parrott and Utz. Nevertheless, a jury could reasonably find that Tobias's continued acquiescence to Condon's presence at the Morgue, his act of leaving Condon alone with an autopsy subject even after viewing his offensive photographs, and his entrustment to Condon of the crime-scene photographs amounted to wanton or reckless conduct.

At the very least, we cannot say as a matter of law that no reasonable jury could make such a finding. This is where we disagree with our dissenting colleague. He concedes that "Tobias may have been negligent" (Dissenting Op. at 20), but has determined as a matter of law that no reasonable jury could find that Tobias's conduct crossed the line from negligence to recklessness. But such distinctions are almost always left for a jury—rather than appellate judges—to decide. *Whitfield v. Dayton*, 854 N.E.2d 532, 540 (Ohio Ct. App. 2006) ("[W]hether particular acts demonstrate the presence of wantonness, recklessness, or merely negligence is normally a decision for the jury, based on the totality of the circumstances."). We see no basis on this record to take that determination away from the jury.

In reaching a contrary conclusion, our dissenting colleague focuses on the fact that Tobias held a relatively low-level position at the Coroner's Office. We fail to discern, however, why Tobias's position would have hindered his ability as a qualified physician to recognize the risks posed by Condon's alleged art project at the Morgue. Similarly, the dissent does not explain why Tobias's position should mitigate his responsibility for acts within the limited scope of his authority, such as allegedly leaving Condon alone to photograph Tobias's own autopsy subject after having seen examples of Condon's offending photographs. The district court thus properly denied Tobias's motion for summary judgment based on statutory immunity as to Chesher's intentional-infliction-of-emotional-distress claim.

Just as Parrott's acts fell within the scope of his employment under *Caruso* and *Martin*, however, so too did Tobias's. *See Caruso*, 737 N.E.2d at 622; *Martin*, 590 N.E.2d at 417. Even though Tobias permitted Condon to continue taking the photos after Tobias realized that some of them were troubling, he likely believed that Condon was also conducting legitimate business. Tobias's actions cannot be said to have been personally motivated, as the court in *Caruso* required, particularly in light of Parrott's acknowledged failure to notify the staff that Condon's project had been cancelled. *See* 737 N.E.2d at 622. Similarly, Tobias's own crime-scene photos and his work at Condon's studio can be seen as work-related or, in any event, not motivated by strictly personal concerns. *See Jackson*, 602 N.E.2d at 366-367.

### 5.     *Utz*

Like Tobias, Utz also knew of the risk posed by Condon's artistic photography. Utz admits that Condon showed him several propped photographs sometime after December 25, 2000. According to Tobias, Utz responded by telling Condon that he thought the photographs were "kind of cool," which a jury could reasonably view as encouragement. Utz again described a particular propped photograph as "cool-looking" in an audiotaped conversation with Daly following the public discovery of the photographs. After seeing some of Condon's offending photographs, moreover, Utz did not object and in fact later permitted Condon to take additional photographs of an autopsy that Utz performed on Christina Folchi.

Utz admits that he saw the photograph of John Brady with a dollhouse ladder propped against his open skull, but claims that he thought it had been digitally enhanced. He further contends that he meant to inform Parrott about this photograph, but that he failed to do so because he was either busy or sick. These explanations may well be true, but for the purposes of summary judgment we must view the evidence in the light most favorable to Chesher as the nonmoving party and draw all reasonable inferences in her favor. Application of that standard leads to the inferences that Utz (1) knew of Condon's offending photography, (2) encouraged Condon by referring to the photographs as "cool," (3) continued to permit Condon to photograph his autopsies, even after seeing the offending photographs, and (4) never reported Condon's offending photographs to any superior or law-enforcement authority.

For the same reasons as set forth above with regard to Parrott's and Tobias's claims, we affirm the district court's denial under § 2744.03(A)(6)(b) of Utz's motion for summary judgment on the intentional-infliction-of-emotional-distress claim. Chesher's allegations against Utz are sufficient to support a jury finding that he acted in a wanton or reckless manner and thus outside the bounds of Ohio's statutory grant of immunity. For the same reasons addressed above in discussing Parrott's immunity, however, we conclude that Utz's actions were not personally motivated and thus not manifestly outside the scope of his employment for the purposes of § 2744.03(A)(6)(a).

## E.     The conspiracy claim

Under Ohio law, a civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). "The malice involved in the tort is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* (citation and quotation marks omitted). Moreover, "[a]n underlying unlawful act is required before a civil conspiracy claim can succeed." *Id.*

The narrow question presented by this interlocutory appeal is whether the employee defendants acted either "manifestly outside the scope" of their employment or "with malicious purpose, in bad faith, or in a wanton or reckless manner" regarding the conduct alleged in Chesher's claims. *See* Ohio Rev. Code Ann. § 2744.03(A)(6)(a) and (b). As to the underlying "unlawful act" alleged in the conspiracy claim (the infliction of emotional distress), the district court ruled that Chesher's allegations, "if true," demonstrate that the defendants' actions fell outside the bounds of statutory immunity. The employee defendants' contentions to the contrary thus presented an issue of law appropriate for interlocutory review. As we concluded above, the employee defendants are not entitled to immunity regarding this "underlying act" element of Chesher's conspiracy claim.

The remaining element of Chesher's conspiracy claim requires that the defendants' actions amount to a "malicious combination." As to that determination, the district court explicitly held that "genuine issues of material fact are in dispute that could lead the jury to conclude that the individual Defendants acted maliciously as required by Ohio law in conspiring to damage the Plaintiffs."

The defendants' motions for summary judgment make clear that they rely on a version of the facts fundamentally at odds with the facts alleged by the plaintiffs regarding the alleged conspiracy. Such being the case, our jurisdiction is constrained by federal procedural law providing that if summary judgment is denied "based upon the district court's determination that a genuine issue of material fact exists, the decision will not be immediately appealable." *Crockett v. Cumberland College*, 316 F.3d 571, 578 (6th Cir. 2003) (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). We thus have no occasion to presently review the district court's holding that genuine issues of material fact are in dispute regarding whether the defendants acted maliciously or in bad faith with respect to Chesher's conspiracy claim.

## IV.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

ROGERS, Circuit Judge, concurring in part and dissenting in part. Although I am in substantial agreement with the majority opinion, I dissent from the portion of the decision affirming the denial of summary judgment as to Dr. Tobias. The plaintiffs' allegations as they relate to Dr. Tobias do not rise to the level of wantonness or recklessness, and Dr. Tobias is entitled to immunity under § 2744.03(A)(6)(b) of the Ohio Revised Code.

Although the facts of this case are gruesome, the shocking details should not render any and all people in Condon's orbit liable simply because hindsight proves that something more could have been done or that certain individuals could have been more vigilant. The facts alleged by the plaintiffs simply do not support denying Dr. Tobias the immunity he is presumed to possess under Ohio law.

The plaintiffs do not allege that Dr. Tobias was at the initial meeting where Condon's plans for an art book were discussed. The plaintiffs themselves acknowledge that Parrott failed to share with personnel at the coroner's office that the planned video project had been cancelled and that "Condon remained a welcome figure at the morgue" throughout 2000. It is undisputed that Dr. Tobias's superiors told him that Condon was allowed access to the morgue. The plaintiffs acknowledge that Dr. Tobias was "the lowest person in the Coroner's office." The plaintiffs have not disputed that Dr. Tobias, after seeing a photo taken by Condon in January 2001, told Condon to show the photograph to someone at the coroner's office and that Condon complied by showing the photo to Dr. Utz. The plaintiffs simply claim that this was not enough.

Given Dr. Tobias's role and position in the coroner's office, I cannot conclude that the summary judgment evidence permits the conclusion that Dr. Tobias acted in such a way that he should be denied immunity under Ohio law. Tobias may have been negligent. Tobias probably could have done more or spoken out to his superiors. However, the fact that Dr. Tobias acted in a way he thought commensurate with his level of authority at the coroner's office, an admittedly negligible level of authority, does not render his actions reckless or wanton. Dr. Tobias's actions were consistent with those of a lower-rung employee with little or no authority over the operation of the coroner's office, who possessed a reasonable belief that those in charge approved of Condon's presence at the morgue. Dr. Tobias did not ban Condon from the morgue, but he did not have the authority to do so; it is undisputed that he was unaware of the cancellation of the project for which Condon was initially retained and demanded what he thought he could of Condon when he questioned the propriety of the photos.

Nor should Dr. Tobias's actions of developing the death scene photos at Condon's studio strip Dr. Tobias of his statutory immunity. It is undisputed that Dr. Tobias was using a camera borrowed from the coroner's office and that the coroner's office did not have film processing facilities. If Dr. Tobias had permission to borrow the film camera from the coroner's office and the coroner's office did not have processing facilities, it was entirely reasonable for Dr. Tobias to take the film somewhere for processing. Given Dr. Tobias's entirely reasonable perception that Condon was a trusted individual at the coroner's office, it was likewise reasonable for Dr. Tobias to take the film to Condon's studio rather than the corner drug store.

Dr. Tobias's actions simply do not reveal that he acted with a perverse disregard of a known risk or with consciousness that his conduct would, in all probability, result in injury. Therefore, he should have been granted summary judgment on the grounds of statutory immunity.