FUSON, Admr., Appellant,

v.

CITY of CINCINNATI et al., Appellees.

[Cite as *Fuson v. Cincinnati* (1993), 91 Ohio App.3d 734.]

Court of Appeals of Ohio,
Hamilton County.

No. C–920759.

Decided Dec. 1, 1993.

*Rodney E. Haun,* for appellant.

*Fay D. DuPuis,* City Solicitor, and *Karl P. Kadon III,* Assistant City Solicitor, for appellees Cincinnati, Michael Bierman, Fireman Joe Doe, Roy Yocum, and Police Officer John Doe.

---

HILDEBRANDT, Judge.

Plaintiff-appellant Barbara Fuson appeals from the summary judgment granted by the Hamilton County Court of Common Pleas in favor of the defendants-

appellees.[1] We affirm.

The record discloses that on March 27, 1989, at approximately 3:40 p.m., James Wilhelm ("Wilhelm") and Debra Lindsey ("Lindsey") discovered the body of Lindsey's brother, Joel Fuson ("Joel"),[2] lying outside the door of the apartment Wilhelm and Lindsey shared. Wilhelm ran to a phone booth outside the apartment building and summoned emergency assistance. When Wilhelm returned and found Joel attempting to stand, he helped Joel inside and laid him on the living-room floor.

By 3:53 p.m., two police officers and two firemen with emergency medical training had arrived. Joel's brother, Gary Fuson ("Gary"), was also present. According to Gary, there was blood coming from Joel's nose and mouth. At some point, Joel told Gary that he had fallen.[3]

According to Wilhelm, when fire personnel asked Joel his age, he responded that he was eighteen years old instead of giving his true age of twenty-four. Joel complained that his head hurt and also told the firemen, who had administered ammonia salts, to "leave him alone." According to Lindsey and Gary, one of the firemen, appellee Roy Yocum ("Yocum"), opined that Joel only wanted attention, that if he was hospitalized it would be on the floor for mentally disturbed patients, and that he would be "okay." Yocum was reported to have further said that if Joel's condition did not improve, the family was to summon fire personnel back to the scene. Yocum then had Gary sign a form that, Yocum stated, was to show that the authorities had responded.[4] In this version of the incident, neither Joel nor his family was asked if they wanted Joel transported to a hospital, nor did anyone present request that the firemen transport Joel to a hospital.

A different version of the events was given by the police officers and fire personnel who had responded. They testified that initially they checked Joel's vital signs, that Joel was uncooperative, and that he refused to go to a hospital when he was asked if he wished to go.

---

1. The trial court also denied appellant's motion for partial summary judgment on the issue of whether appellant's claim was barred by sovereign immunity.

2. Joel Fuson is referred to throughout the record as "Joe."

3. It is evident from the record that the authorities immediately suspected that Joel had been in a physical altercation with Wilhelm, an accusation that Wilhelm repeatedly denied. The pathologist who performed the post-mortem on Joel found abrasions on his right knuckles which were consistent with Joel having been in a fist fight.

4. The document, titled "Cincinnati Fire Division Run Report," also indicated that Joel was uncooperative, that he refused to sign and that he refused to be transported to a hospital.

It is not disputed that Joel's condition deteriorated rapidly after the police officers and fire personnel left. Gary, who remained with Joel, noticed fresh blood coming from Joel's mouth and Joel began to choke. Gary again telephoned for emergency assistance, and fire personnel returned at 6:00 p.m. Joel was placed in an ambulance where fire personnel administered to him for approximately forty-five minutes. Thereafter, he was transported to a hospital. Despite these efforts, Joel expired. Amy Martin, M.D., the Chief Deputy Hamilton County Coroner, testified that Joel's death was the result of acute epidural hematoma due to blunt trauma to the head.[5]

Appellant, as the administrator of Joel's estate, initiated the instant wrongful-death action on July 21, 1989. The complaint was amended on June 12, 1990.[6] Appellees answered and, following a period of discovery, moved for summary judgment on July 2, 1992. Summary judgment was entered in their favor on September 17, 1992.

In her only assignment of error, appellant asserts that the trial court erred in granting summary judgment to the appellees. Appellant's first argument in support of the assignment of error is that a genuine issue of material fact remains as to whether the actions of the appellees constituted willful or wanton misconduct. Appellant's argument is without merit.

R.C. 2744.02(A)(1) provides in part:

"[T]he functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

R.C. 2744.01(C) defines a "governmental function" as:

"(c) A function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function.

"(2) A 'governmental function' includes, but is not limited to, the following:

"(a) The provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection[.]"

---

5. Dr. Martin described an epidural hematoma as a blood clot that presses against the brain. The clot forms as a result of a skull fracture.

6. Appellant's theories of liability will be discussed *infra*.

However, R.C. 3303.21 [7] provides that no emergency medical technician, paramedic or political subdivision is liable in civil damages for injury, death or loss to persons or property resulting from the administration of emergency medical care or treatment, unless that care is administered in a manner constituting willful or wanton misconduct. R.C. 1.51 mandates that where a general provision conflicts with a special provision, they are to be construed, wherever it is possible, to give effect to both. If they are irreconcilable, the special provision prevails as an exception to the general provision.

In *Swanson v. Columbus* (1993), 87 Ohio App.3d 748, 622 N.E.2d 1181, the court determined that R.C. 2744.02(A) confers blanket immunity upon political subdivisions with respect to all governmental functions unless R.C. 2744.02(B) specifically imposes liability.[8] Because R.C. 3303.21 pertains specifically to emergency medical services and, further, limits the immunity of a political subdivision and its emergency employees to cases not involving willful and wanton misconduct, it is reconcilable with R.C. 2744.02(B), and we must, accordingly, address whether the evidence in this case reasonably supports a conclusion that the instant appellees engaged in willful and wanton misconduct.

In *State v. Earlenbaugh* (1985), 18 Ohio St.3d 19, 18 OBR 16, 479 N.E.2d 846, the court discussed the terms "willful" and "wanton" in addressing the constitutionality of R.C. 4511.20. The court stated that willful conduct "implies an act done intentionally, designedly, knowingly, or purposely, without justifiable excuse." Further, the court explained that a wanton act is "an act done in reckless disregard of the rights of others which evinces a reckless indifference of the consequences to the life, limb, health, reputation, or property of others." *Earlenbaugh* at 21–22, 18 OBR at 18, 479 N.E.2d at 849.

More recently, in *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 104–105, 559 N.E.2d 705, 708, the court quoted from 2 Restatement of the Law 2d, Torts (1965) for a definition of "recklessness" and determined that the definition applies to willful and wanton conduct as well. The court stated:

"The Restatement of Torts 2d defines 'recklessness' as follows:

" 'The actor's conduct is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to

7. Effective November 12, 1992, the provisions of R.C. 3303.21 were codified under R.C. 4765.49.

8. Under R.C. 2744.02(B)(5), a political subdivision's liability arises whenever it is "expressly imposed * * * by a section of the Revised Code, including, but not limited to, sections 2743.02 and 5591.37[.]"

another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' 2 Restatement of the Law 2d, Torts (1965), at 587, Section 500. Comment *f* to Section 500 contrasts recklessness and intentional misconduct: 'While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it.' *Id.* at 590. Comment *a* to Section 500 adds that ' * * * the risk must itself be an unreasonable one *under the circumstances.*' (Emphasis added.) *Id.* at 588." See, also, *Brockman v. Bell* (1992), 78 Ohio App.3d 508, 605 N.E.2d 445.

■ We have set forth the facts of this case above. Those facts include the following: that emergency personnel initially checked Joel's vital signs; that Joel stated that he wished to be left alone; that no family member requested that Joel be transported to a hospital; and that the emergency personnel told the family that if Joel's condition did not improve, the family should call and they would return. In viewing those facts, as we must, most strongly in favor of appellant, we cannot say that the record demonstrates that the actions of the responding emergency employees rose to the level of wanton or willful misconduct.

■ Appellant next argues that summary judgment was inappropriate because a genuine issue remains as to whether the circumstances gave rise to a special duty or relationship. We are unpersuaded.

Appellant relies upon *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468, for the proposition that appellees' failure to transport Joel to a hospital subjects them to liability because of the special-duty exception. *Sawicki* held that the following elements must be proven to establish when a public official owes a special duty to an individual, rather than to the general public:

"(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking." *Sawicki, supra,* at paragraph four of the syllabus.

We find that appellant's reliance on *Sawicki* is misplaced for two reasons. First, under the above criteria, the evidence does not demonstrate that the appellees owed a special duty to Joel. Second, in *Swanson, supra,* the court rejected the plaintiff's special-duty argument, reasoning that neither *Sawicki, supra,* nor *Commerce & Industry Ins. Co. v. Toledo* (1989), 45 Ohio St.3d 96, 543 N.E.2d 1188, applied the current statutory rules of liability under R.C.Chapter 2744. Instead, the appellate court observed that those cases merely limited what was once a matter of common-law liability under certain circumstances where a special duty existed.

■ Appellant's final two arguments in support of the assignment of error are that, pursuant to Section 1983, Title 42, U.S.Code,[9] summary judgment was inappropriate where genuine issues of material fact remain as to whether there was a municipal policy that was injurious to Joel, and whether the municipality breached its qualified immunity.[10] We choose to address these arguments as one.

■ Appellant contends in support of these arguments that the appellee city had in place a policy that fire and police personnel were not to transport an injured person to a hospital against his will. The record does not support appellant's contention that the city had such a policy in place. The record does disclose that three city emergency employees, including Captain Yocum, testified that they did not transport persons to a hospital if they refused to go because to do otherwise would have been a violation of the Fourth Amendment. Even if this was evidence of a practice that constituted a custom, as contemplated under the federal statute, it was not imputable to the city.

In *Steplight v. Belpulsi* (1991), 76 Ohio App.3d 384, 601 N.E.2d 656, Belpulsi, a police officer, secretly recorded the appellant's telephone conversation during a homicide investigation in which appellant was a suspect. During the conversation, appellant asked a potential trial witness to testify to matters that were untrue. Appellant was acquitted of the homicide charge. However, during that proceeding she became aware of the officer's surreptitious recording, and she later brought a Section 1983 action against the officer and the municipality that employed him. The trial court directed a verdict in favor of the defendants. The court of appeals affirmed, stating that appellant failed to produce evidence that the city had a policy or custom of violating Sixth Amendment rights.

As in *Steplight v. Belpulsi*, the appellant here has not established that the city of Cincinnati had in place a custom or policy by which its emergency personnel were not to transport any injured person who refused to be hospitalized. Further, even in light of the statements of the three emergency employees that they would not transport an injured person under such circumstances, there is no evidence of record of other refusals to transport, nor has appellant cited any law or ordinance which the appellee employees may have violated. Instead, appellant argues that the employees' failure to transport Joel constituted willful, wanton

---

**9.** The statute provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**10.** Qualified immunity protects individuals rather than municipalities. See *Owen v. City of Independence, Mo.* (1980), 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673.

and reckless misconduct, as well as a violation of a special duty. We have rejected both contentions *supra.*

In *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, the court held in the third paragraph of the syllabus that "[a] motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial. (*Celotex Corp. v. Catrett* [1986], 477 U.S. 317 [106 S.Ct. 2548, 91 L.Ed.2d 265], approved and followed.)" Because appellant has failed to demonstrate the existence of the policy of which she complains, we find her final two arguments in support of the assignment to be without merit and affirm the judgment of the court of common pleas.

*Judgment affirmed.*

DOAN, P.J., and GORMAN, J., concur.