**WIDEN, Exr., et al., Appellants,**

v.

**COUNTY OF PIKE et al., Appellees.**

[Cite as *Widen v. Pike Cty.*, 187 Ohio App.3d 510, 2010-Ohio-2169.]

Court of Appeals of Ohio,
Fourth District, Pike County.

No. 09CA794.

Decided May 10, 2010.

512

Elk & Elk, John W. Gold, and William J. Price, for appellants.

Randall L. Lambert, for appellees.

---

KLINE, Judge.

{¶ 1} Frederick N. Widen, administrator of the estate of Cecil Holbrook Jr., appeals the judgment of the Pike County Court of Common Pleas. Widen sued the county of Pike and Deputy Delbert Slusher after Cecil Holbrook Jr. died in a traffic accident. Deputy Slusher was directing traffic at the intersection where the accident occurred. Because of sovereign immunity, the trial court granted summary judgment in favor of Pike County and Deputy Slusher. On appeal, Widen contends that the trial court erred by granting summary judgment in favor of Pike County because one of the exceptions to sovereign immunity applies. We disagree. Based on the most natural and obvious reading of R.C. 2744.02(B)(3), Deputy Slusher could not have negligently failed to remove an obstruction from the intersection. Therefore, we find that no exception to sovereign immunity applies to Pike County. Widen also contends that the trial court erred by granting summary judgment in favor of Deputy Slusher. We agree. We find that (1) a genuine issue of material fact exists whether Deputy Slusher acted recklessly while directing traffic and (2) a reasonable person could conclude that Deputy Slusher acted recklessly. Therefore, Deputy Slusher is not entitled to immunity as a matter of law. Accordingly, we affirm in part and reverse in part the judgment of the trial court and remand this cause to the trial court for further proceedings consistent with this opinion.

I

{¶ 2} On April 18, 2004, a funeral procession was traveling east on State Route 32 in Pike County, Ohio. Deputy Slusher and his patrol car were positioned at the intersection of State Route 32, State Route 220, and Germany Road. At this intersection, State Route 32 is a divided highway with a 60-mile-per-hour speed limit. It runs, generally, in an east-west direction. In contrast, State Route 220 is a two-lane road that runs, generally, in a north-south direction. State Route 220 turns into Germany Road as it runs south across State Route 32 (conversely, Germany Road turns into State Route 32 as it runs north across the intersection). Traffic signals at this intersection flashed yellow for the traffic on State Route 32 and flashed red for the traffic on State Route 220/Germany Road. There were also stop signs and divided highway signs for the traffic traveling on State Route 220/Germany Road across State Route 32.

{¶ 3} The funeral was proceeding east on State Route 32 and turning south (right) onto Germany Road. During the procession, Deputy Slusher began directing traffic into the intersection. There were at least three vehicles stopped

at the northern point of the intersection, that is, headed south on State Route 220 and stopped at State Route 32. The first vehicle in line was a motorcycle. Cecil was driving the second vehicle in line, which was a gray Chevrolet Cavalier convertible. Cecil's wife, Francine Holbrook, was a passenger in the Cavalier. James and Rita Smith were in the vehicle immediately behind the Holbrooks.

{¶ 4} Deputy Slusher started directing these vehicles into the intersection, across State Route 32 West, and left onto State Route 32 East. Deputy Slusher motioned for the motorcycle to proceed, and the motorcycle made it safely onto State Route 32. Next, Cecil pulled into the intersection. (There is some dispute as to whether Deputy Slusher (1) motioned for Cecil to proceed, (2) motioned for Cecil to stop, or (3) directed traffic in a dangerously ambiguous manner.) At the same time that Cecil pulled into the intersection, Janice Mould was traveling west on State Route 32 in her Chevrolet Trailblazer. Mould crashed into Cecil's Cavalier, and Cecil died as a result of the crash.

{¶ 5} On April 12, 2006, Widen, as the administrator of Cecil's estate, filed suit against Pike County, Ohio, Deputy Slusher, and Mould.[1] Later, the trial court consolidated Widen's case with Francine's own case against various defendants, including both Pike County and Deputy Slusher.

{¶ 6} On April 4, 2008, Pike County and Deputy Slusher moved for summary judgment with regard to all claims in the consolidated cases. (In addition to Widen and Francine, Mould also asserted claims against Pike County and Deputy Slusher.) In a February 19, 2009 decision, the trial court granted summary judgment in favor of Pike County and Deputy Slusher as to all claims. The trial court found that sovereign immunity applied to both Pike County, as a political subdivision, and Deputy Slusher, as the employee of a political subdivision.

{¶ 7} The trial court further found that there was "no just reason for delay," and Widen filed this timely appeal. He asserts the following two assignments of error: "I. The trial court committed reversible error when it granted summary judgment because the political subdivision defendants negligently failed to keep the intersection of SR 32 and SR 220 free from obstruction," and "II. The trial court committed reversible error when it granted summary judgment in favor of

---

1. In his complaint, Widen filed claims against the Pike County commissioners and the Pike County Sheriff's Department. However, as the trial court explained, "[n]othing in the pleadings * * * or in the evidence or arguments of counsel manifests an intention to sue [the Pike County commissioners] as individuals, or shows any basis for a claim against any of them personally. The Pike County Sheriff's Department is not an entity capable of suing or being sued. Therefore, it would appear that in naming [the] 'Pike County Comissioners' * * * and 'Pike County Sheriff's Department' as parties defendant, the intention is to assert claims against Pike County, Ohio.''

Deputy Slusher because genuine issues of material fact exists [sic] with respect to his recklessness."

## II

{¶ 8} In his first assignment of error, Widen argues that the trial court should not have granted summary judgment in favor of Pike County because an exception to sovereign immunity applies. Specifically, Widen contends that his case should proceed against Pike County because of R.C. 2744.02(B)(3).

### A. Summary–Judgment Standard

{¶ 9} "Because this case was decided upon summary judgment, we review this matter de novo, governed by the standard set forth in Civ.R. 56." *Comer v. Risko,* 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Summary judgment is appropriate only when the following have been established: (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(C). See also *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881; *Grimes v. Grimes,* Washington App. No. 08CA35, 2009-Ohio-3126, 2009 WL 1830761, ¶ 14. In ruling on a motion for summary judgment, the court must construe the record and all inferences that arise from it in the opposing party's favor. *Doe v. First United Methodist Church* (1994), 68 Ohio St.3d 531, 535, 629 N.E.2d 402.

{¶ 10} The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 662 N.E.2d 264. However, once the movant supports his or her motion with appropriate evidentiary materials, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). See also *Dresher* at 294–295, 662 N.E.2d 264; *Grimes* at ¶ 15.

{¶ 11} "In reviewing whether an entry of summary judgment is appropriate, an appellate court must independently review the record and the inferences that can be drawn from it to determine if the opposing party can possibly prevail." *Grimes* at ¶ 16. "Accordingly, we afford no deference to the trial court's decision in answering that legal question." *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 412, 599 N.E.2d 786. See also *Schwartz v. Bank One, Portsmouth, N.A.* (1992), 84 Ohio App.3d 806, 809, 619 N.E.2d 10; *Grimes* at ¶ 16.

### B.  Sovereign Immunity

{¶ 12} "The Political Subdivision Tort Liability Act, as codified in R.C. Chapter 2744, sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability." *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610; see also *Elston v. Howland Local Schools,* 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 10.  The first tier involves determining whether the political subdivision is generally immune from liability under R.C. 2744.02(A)(1).  *Elston* at ¶ 10;  see also *Hortman v. Miamisburg,* 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 12.

{¶ 13} Once immunity is generally established, "the second tier of analysis is whether any of the five exceptions to immunity in subsection (B) apply." *Hortman,* id. at ¶ 12.  Only when one of the exceptions listed in R.C. 2744.02(B) applies do courts move to the third tier.  *Terry v. Ottawa Cty. Bd. of Mental Retardation & Dev. Disabilities,* 151 Ohio App.3d 234, 2002-Ohio-7299, 783 N.E.2d 959, ¶ 13; *Dolan v. Glouster,* 173 Ohio App.3d 617, 2007-Ohio-6275, 879 N.E.2d 838, ¶ 17.  See also Gotherman & Babbit, Ohio Municipal Law (2d Ed.1992), Section 32.4 ("The defenses and immunities provided to a political subdivision by R.C. 2744.03(A) only become relevant if one of the five exceptions to immunity in R.C. 2744.02(B) applies to render the subdivision vulnerable to liability").  If an exception to the general immunity provision does apply, "under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that any of the defenses contained in R.C. 2744.03 applies." *Hortman* at ¶ 12.

{¶ 14} Here, the general grant of immunity under R.C. 2744.02(A)(1) does apply to Pike County.  First, the county is indeed a political subdivision.  See R.C. 2744.01(F).  Moreover, Deputy Slusher is an employee of Pike County.  See R.C. 2744.01(B).  Under R.C. 2744.02(A)(1), the general rule is that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  R.C. 2744.01(C)(2)(a) provides: "A 'governmental function' includes * * * [t]he provision or nonprovision of *police,* fire, emergency medical, ambulance, and rescue services or protection."  (Emphasis added.)  And under 2744.01(C)(2)(j), a governmental function includes "[t]he *regulation of traffic,* and the erection or nonerection of traffic signs, signals, or control devices."  (Emphasis added.)  Thus, by directing traffic at the intersection, Deputy Slusher was performing a governmental function.  See also *Grooms v. Crawford,* Brown App. Nos. CA2005–05–008 and CA2005–05–009, 2005-Ohio-7028, 2005 WL 3588422, ¶ 16 ("directing the flow of traffic promotes the public

safety * * * and concerns the maintenance and regulation of the use of roads, highways, and streets").

{¶ 15} Next, we must determine whether any of the exceptions to immunity apply. Widen contends that R.C. 2744.02(B)(3) applies to the present case. R.C. 2744.02(B)(3) provides that "political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads." Essentially, Widen claims that Deputy Slusher negligently failed to remove an obstruction (i.e., Mould's automobile) from the intersection while directing traffic. The trial court granted summary judgment in favor of Pike County, reasoning that R.C. 2744.02(B)(3) "does not apply to the present case, even if the definition of the term 'obstruction' espoused by the Plaintiff is adopted." On appeal, we must determine whether the exception under R.C. 2744.02(B)(3) could apply to the present case.

{¶ 16} To resolve this issue, we must interpret R.C. 2744.02(B)(3). Interpreting a statute is a question of law, and "[w]e review questions of law de novo." *State v. Elkins*, Hocking App. No. 07CA1, 2008-Ohio-674, 2008 WL 444633, ¶ 12, quoting *Cuyahoga Cty. Bd. of Commrs. v. State*, 112 Ohio St.3d 59, 2006-Ohio-6499, 858 N.E.2d 330, ¶ 23. A court starts its analysis of a statute by applying the legislative intent as manifested in the statute's words. *Proctor v. Kardassilaris*, 115 Ohio St.3d 71, 2007-Ohio-4838, 873 N.E.2d 872, ¶ 12. "In construing the terms of a particular statute, words must be given their usual, normal, and/or customary meanings." Id. When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no need to apply rules of statutory construction. Id. See also *Cline v. Ohio Bur. of Motor Vehicles* (1991), 61 Ohio St.3d 93, 96, 573 N.E.2d 77; *Sears v. Weimer* (1944), 143 Ohio St. 312, 28 O.O. 270, 55 N.E.2d 413, paragraph five of the syllabus. However, when a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction to arrive at legislative intent. R.C. 1.49; *Cline* at 96, 573 N.E.2d 77; *Meeks v. Papadopulos* (1980), 62 Ohio St.2d 187, 190–191, 16 O.O.3d 212, 404 N.E.2d 159; *Carter v. Division of Water, City of Youngstown* (1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63.

### 1. Definition of Obstruction

{¶ 17} First, we must determine whether Mould's Trailblazer could qualify as an "obstruction." Recently, the Supreme Court of Ohio "conclude[d] that for purposes of R.C. 2744.02(B)(3), an 'obstruction' must be an obstacle that blocks or clogs the roadway and not merely a thing or condition that hinders or impedes the use of the roadway or that may have the potential to do so."

*Howard v. Miami Twp. Fire Div.,* 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, ¶ 30.

{¶ 18} "The current version of R.C. 2744.02(B)(3) was amended in * * * April 2003. Prior to that date, R.C. 2744.02(B)(3) read, '[P]olitical subdivisions are liable for injury, death, or loss to person or property caused by their failure to keep public roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, or public grounds within the political subdivisions open, in repair, *and free from nuisance* * * *.' " (Emphasis sic.) Id. at ¶ 24. Widen argues that "[t]he *Howard* decision does not supersede the body of nuisance law already on the books." We disagree. The Supreme Court of Ohio "discern[ed] a legislative intent to limit political-subdivision liability for roadway injuries and deaths. The General Assembly, in furtherance of its goal, used the word 'obstructions' in a deliberate effort to impose a condition more demanding than a showing of a 'nuisance' in order for a plaintiff to establish an exception to immunity." Id. at ¶ 29. Therefore, we believe that the nuisance cases decided under the prior version of R.C. 2744.02(B)(3) have no application to the present case. See, e.g., *Laurie v. Cleveland,* Cuyahoga App. No. No. 91665, 2009-Ohio-869, 2009 WL 483175, ¶ 57 ("Thus, under * * * the former R.C. 2744.02(B)(3), the overhanging tree branches at issue here could have constituted a 'nuisance' and the exception to immunity could have applied. But under the current version of the statute, as explained in *Howard,* the overhanging tree branches were not an 'obstruction.' Accordingly, the R.C. 2744.02(B)(3) exception does not apply"). Regardless, we believe that Mould's Trailblazer qualifies as an obstruction under *Howard.*

{¶ 19} Here, Cecil pulled into the intersection, but he did not make it safely onto State Route 32 East after being hit by Mould's Trailblazer. Indeed, Mould's Trailblazer prevented Cecil from making it safely through the intersection. Thus, according to *Howard* and the plain language of 2744.02(B)(3), we believe that Mould's Trailblazer was an obstacle that blocked the roadway for Cecil. As such, Mould's Trailblazer qualifies as an obstruction under R.C. 2744.02(B)(3).

## 2. Failure to Remove an Obstruction

{¶ 20} We have found that Mould's Trailblazer qualifies as an obstruction. But that does not mean that R.C. 2744.02(B)(3) necessarily applies to the present case. Widen's first assignment of error contends that Pike County "failed to keep the intersection of SR 32 and SR 220 free from obstruction." However, this assignment of error does not track the language of R.C. 2744.02(B)(3), which states that "political subdivisions are liable for injury, death, or loss to person or property caused by their * * * *negligent failure to remove* obstructions from public roads." (Emphasis added.) Therefore, the relevant inquiry is whether

Deputy Slusher could have negligently failed to remove Mould's Trailblazer from the intersection.

{¶ 21} Here, the issue turns on the definition of "remove." In the context of R.C. 2744.02(B)(3), "remove" is a transitive verb. Therefore, it could have one of the following meanings: "1: to change or shift the location, position, station, or residence of (as in order to reestablish) : SHIFT, TRANSFER—usu. used with *to* and specified place * * * 2: to move by lifting, pushing aside, or taking away or off: put aside, apart, or elsewhere * * * 3. to force (one) to leave a place or to go away: as **a:** to dismiss from office * * * 4. to get rid of as though by moving: ERADICATE, ELIMINATE." Webster's Third New International Dictionary (2002) 1921. According to some of these definitions, it is possible that R.C. 2744.02(B)(3) could apply to the present case. For example, one could argue that Deputy Slusher acted negligently either in failing to change the location of the Trailblazer or in failing to eliminate the Trailblazer from Cecil's path. Under this argument, Deputy Slusher could have failed to remove (change the location of, eliminate) the obstruction (Mould's Trailblazer) from the public road (the intersection of State Route 32, State Route 220, and Germany Road).

■ {¶ 22} "A basic rule of statutory construction is that words used therein 'should be interpreted according to the most natural and obvious import of the language, without resorting to subtle or forced construction for the purpose of either limiting or extending their operations * * *.'" *In re Osborn's Estate* (1953), 159 Ohio St. 63, 70, 50 O.O. 57, 110 N.E.2d 791, quoting *Bd. of Natl. Missions of Presbyterian Church v. Neeld* (1953), 9 N.J. 349, 88 A.2d 500, 502.

{¶ 23} By using the phrase "remove obstructions from public roads," we believe that the General Assembly intended for the obstruction to already exist in the roadway. If a political subdivision asked an employee to remove an obstruction from an intersection, that employee would most likely (1) go to the intersection, (2) look for an obstruction, and (3) move any obstructions out of the way of traffic. And if the employee found no obstructions at the intersection, the employee would certainly inform his or her superior of this fact. It strains credulity to assume that the employee would go to the intersection and upon finding no obstructions, stand on guard to prevent any potential obstructions from occurring. Such a result would be absurd, and "[i]t is presumed that the legislature does not intend absurd results." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 56, citing *State ex rel. Haines v. Rhodes* (1958), 168 Ohio St. 165, 5 O.O.2d 467, 151 N.E.2d 716, paragraph two of the syllabus.

■ {¶ 24} Therefore, in the context of R.C. 2744.02(B)(3), we believe that the most natural and obvious meaning of "remove" is either (1) "to move by lifting,

pushing aside, or taking away or off" or (2) "to get rid of as though by moving." These definitions of "remove" assume that the actor is engaged in the physical act of moving an object that is already in place. Thus, the natural and obvious meaning of "negligent failure to remove obstructions from public roads" is that the political subdivision negligently failed to move an obstruction that was already blocking the public roadway.

{¶ 25} Further, we believe this construction comports with the purpose of the new R.C. 2744.02(B)(3). As noted above, the amendments to R.C. 2744.02(B)(3) were a "deliberate effort to limit political subdivisions' liability for injuries and deaths on their roadways." *Howard*, 119 Ohio St.3d 1, 2008-Ohio-2792, 891 N.E.2d 311, at ¶ 26. And an expansive reading of R.C. 2744.02(B)(3)—one that incorporates all possible definitions of the word "remove"—would not further the goal of limiting liability.

{¶ 26} Under the most obvious and natural reading of the statute, the exception to sovereign immunity under R.C. 2744.02(B)(3) could not apply to the present case. Mould's Trailblazer was not an obstruction that was already in place; the Trailblazer was not blocking or clogging the intersection at any time before the accident occurred. Arguably, Deputy Slusher might have failed to prevent an obstruction from occurring at the intersection. But he could not have failed to physically move the Traiblazer by lifting it, pushing it aside, or taking it away or off of the intersection. Similarly, Deputy Slusher could not have failed to get rid of the Trailblazer by physically moving it away from the intersection. In other words, he could not have failed to physically remove an obstruction that was already in place.

{¶ 27} For the foregoing reasons, we find that the exception to immunity under R.C. 2744.02(B)(3) does not apply to the present case. Therefore, Pike County is entitled to immunity and judgment as matter of law. Accordingly, we overrule Widen's first assignment of error.

### III

{¶ 28} In his second assignment of error, Widen contends that the trial court erred by granting summary judgment in favor of Deputy Slusher. Widen claims that genuine issues of material fact exist as to whether Deputy Slusher acted recklessly while directing traffic. Again, we analyze Widen's second assignment of error under the summary-judgment standard of de novo review.

{¶ 29} Under R.C. 2744.03(A)(6)(b), an employee of a political subdivision "is immune from liability unless * * * [t]he employee's acts or omissions were with

malicious purpose, in bad faith, or in a wanton or reckless manner." [2]   There is no dispute that Deputy Slusher, a deputy with the Pike County sheriff's office, qualifies as an employee.   See R.C. 2744.01(B).

■■ {¶ 30} "In a case involving a county employee's immunity, the Ohio Supreme Court recently stated that '[r]ecklessness is a perverse disregard of a known risk.   Recklessness, therefore, necessarily requires something more than mere negligence.   The actor must be conscious that his conduct will in all probability result in injury.' "   *Scott v. Longworth,* 180 Ohio App.3d 73, 2008-Ohio-6508, 904 N.E.2d 557, ¶ 12, quoting *O'Toole,* 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at paragraph three of the syllabus.   "Distilled to its essence, and in the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk."   *O'Toole* at ¶ 73.   And "[a]lthough the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate in those instances where the individual's conduct does not demonstrate a disposition to perversity."   Id. at ¶ 75.

■ {¶ 31} Here, after reviewing the record, we believe that a genuine issue of material fact exists whether Deputy Slusher acted recklessly while directing traffic.   First, we note the deposition testimony of James Smith.   In statements made soon after the accident, James Smith said that Deputy Slusher directed Cecil into the intersection.

{¶ 32} "Q:  You, according to the report, indicated to the officer at the time, and I quote, a deputy waved the gray convertible from State Route 220 to State Route 32 eastbound, end quote, correct?

{¶ 33} "A:  To the best of my recollection, yes, but there was times [sic] I was looking away.   It was brought up that did I see it at the actual time it pulled out. I can't recall.   This is probably—

{¶ 34} "Q:  I understand.   I'm just asking about the report right now, what's on the report.   I read that correctly, didn't I? The statement is, quote, the deputy waved the gray convertible from State Route 220 to State Route 32 eastbound, period, correct?

{¶ 35} "A:  You read that correctly, yes.

---

2.   "The Political Subdivision Tort Liability Act, as codified in R.C. Chapter 2744, sets forth a three-tiered analysis for determining whether a political subdivision is immune from liability." *Cater,* 83 Ohio St.3d at 28, 697 N.E.2d 610.   However, in determining whether the *employee* of a political subdivision is immune from liability, we do not use the three-tiered system of analysis.   See, e.g., *Webb v. Edwards,* 165 Ohio App.3d 158, 2005-Ohio-6379, 845 N.E.2d 530, at ¶ 28–31;   R.C. 2744.03(A)(1) through (7).

{¶ 36} "Q: And then the following sentence says that's when the gray convertible pulled out and was hit by another car going westbound on State Route 32, correct?

{¶ 37} "A: That's what the statement says, yes."

{¶ 38} James Smith also testified about another statement he gave four days after the accident.

{¶ 39} "Q: And then they specifically asked you the question, quote, did the deputy wave the convertible out onto State Route 32, and your answer was, yes, he was still directing traffic to go after the motorcycle.

{¶ 40} "A: That's the way I remember it, yes.

{¶ 41} "Q: Do you at any time have any recollection of [Deputy Slusher] making any gestures or motions to stop?

{¶ 42} "A: No, I do not."

{¶ 43} However, James Smith also testified to the following:

{¶ 44} "Q: Now, based upon reviewing the three statements, your drawing, and what you have said today, let me just ask you a few summary questions that I perceive from what you're saying is accurate. If it's not accurate, please tell me, okay?

{¶ 45} "A: Okay.

{¶ 46} "Q: It's true that at some point after the motorcycle entered the intersection, you observed the officer still directing traffic?

{¶ 47} "A: Yes.

{¶ 48} "Q: You don't recall when that was after the motorcycle left, at what point in time you were or the Cavalier was when he was directing traffic?

{¶ 49} "A: To the best of my recollection, he was still directing as the motorcycle had left and went through the intersection.

{¶ 50} "Q: Okay. You don't recall what happened as far as the officer is concerned from the time the Cavalier stopped at the stop sign until the accident occurred?

{¶ 51} "A: No. At that time, I can't say because I wasn't looking that direction."

{¶ 52} We must construe James Smith's testimony and all inferences from it in Widen's favor. Therefore, we find evidence to suggest that Deputy Slusher waved Cecil into the intersection. But this finding, by itself, does not support the inference that Deputy Slusher acted recklessly as opposed to negligently. However, for the reasons discussed below, we believe that (1) a genuine issue of

material fact exists to whether Deputy Slusher's conduct was reckless and (2) reasonable minds could conclude that he did act recklessly.

{¶ 53} In his deposition, James Smith also testified about the motorcycle in front of Cecil's Cavalier. Apparently, Deputy Slusher waved the motorcycle into the intersection despite the presence of westbound traffic on State Route 32.

{¶ 54} "Q: So when the officer motioned the motorcycle, he started to move up and then stopped?

{¶ 55} "A: To the best of my recollection, yes.

{¶ 56} "Q: And then the vehicle come by [sic] and then the motorcycle went on?

{¶ 57} "A: That's the best of my recollection, yes.

{¶ 58} " * * *

{¶ 59} "Q: On the last page you were asked when the deputy first directed the motorcycle to pull out, had he pulled out would it be possible he may have been struck. You said yes, probably.

{¶ 60} "A: That was just my perception of it too from what I can remember at the time."

{¶ 61} Rita Smith also testified about Deputy Slusher's actions while directing traffic.

{¶ 62} "Q: Your husband at the time said he thought that you commented to him, quote, why is he doing that, someone is going to get hurt, period, end quote.

{¶ 63} "Do you have any idea who the he is that that would have been attributed to? In other words, was it the police officer? Was it actions of the police officer?

{¶ 64} "[Mould's Attorney]: Objection.

{¶ 65} "[The Witness]: I was thinking it may have been the deputy motioning them out and I was afraid people were going to go out in front of traffic. But I remember saying somebody is going to get hurt. That's all I remember saying.

{¶ 66} "Q: [Francine Holbrook's Attorney]: And was that impression stimulated in any way by the actions or inactions of the police officer?

{¶ 67} "A: It was from my feeling that the people weren't going to look for the traffic coming.

{¶ 68} "Q: Was that because of some direction or actions that the police officer was giving?

{¶ 69} "A: The police officer motioned for our line of traffic to come out to come across wherever they were going, and I was afraid people weren't going to take the time to look for themselves.

{¶ 70} "Q: And just rely on the actions of the police officer?

{¶ 71} "A: Right."

{¶ 72} Here, we find evidence to suggest that Deputy Slusher waved the motorcycle into the intersection despite the presence of oncoming traffic and that Deputy Slusher's actions frightened at least one onlooker. We believe that this evidence supports an inference of recklessness. Construing the evidence in Widen's favor, a reasonable person could find that Deputy Slusher waved the motorcycle into the intersection. And despite being waved through, the motorcycle had to stop to avoid a potential collision. This incident happened right in front of Deputy Slusher and immediately before the crash involving the Trailblazer and the Cavalier. The incident with the motorcycle suggests that Deputy Slusher either knew or should have known of the risk inherent at the intersection at that time. Even Rita Smith was aware of the inherent danger, but Deputy Slusher did not stop to reassess the situation. Instead, he waved Cecil into the intersection despite the presence of the oncoming Trailblazer. Thus, we believe a genuine issue of material fact exists as to whether Deputy Slusher acted with the perverse disregard of a known risk. As a result, we also believe that a reasonable person could conclude that Deputy Slusher acted recklessly while directing traffic.

{¶ 73} Deputy Slusher and Pike County rely on *Grooms*, 2005-Ohio-7028, 2005 WL 3588422. In *Grooms*, a volunteer fireman was directing traffic at an accident scene. A second accident occurred while the volunteer fireman was directing traffic. This accident happened when two vehicles attempted to cross the intersection simultaneously. Similar to the present case, the appellant in *Grooms* claimed that the volunteer fireman waved one of the cars into the intersection.

{¶ 74} The volunteer fireman "admitted that he was coming off of very little sleep when he responded to the accident. He admitted he had little training in directing traffic and that the intersection was too much for one person to control. He did not recall waiving [sic] [a] vehicle into the intersection, and he admittedly 'just froze' when he saw that [the] vehicle[s] were about to collide." Id. at ¶ 45. Based on these facts, the Twelfth District Court of Appeals held that "[n]o reasonable jury could conclude from the foregoing that Miller acted with malice, bad faith, wantonly, or recklessly when he directed traffic at the scene of the accidents. At worst, his actions were negligent." Id. at ¶ 46.

{¶ 75} We do not believe that *Grooms* stands for the proposition that one cannot act recklessly while directing traffic, and the facts in the present case

differ from the facts in *Grooms*. Specifically, there is no indication in *Grooms* that an accident almost occurred just before the volunteer fireman waved one of the cars into the intersection. Construing the evidence in Widen's favor, that could have happened in the present case. In our view, the incident with the motorcycle (1) distinguishes the present case from *Grooms* and (2) establishes a genuine issue of material fact whether Deputy Slusher perversely disregarded a known risk. Thus, we do not believe that Deputy Slusher is entitled to immunity as a matter of law.

{¶ 76} Accordingly, for the foregoing reasons, we sustain Widen's second assignment of error.

## IV

{¶ 77} In conclusion, we find that the trial court did not err by granting summary judgment in favor of Pike County. Deputy Slusher could not have negligently failed to remove an obstruction from the intersection. Therefore, no exception to sovereign immunity applies, and Pike County is entitled to judgment as a matter of law. However, we also find that the trial court erred by granting summary judgment in favor of Deputy Slusher. We believe that a genuine issue of material fact exists as to whether Deputy Slusher acted with the perverse disregard for a known risk. For that reason, a reasonable person could conclude that Deputy Slusher acted recklessly while directing traffic. Accordingly, we affirm in part and reverse in part the judgment of the trial court and remand this cause to the trial court for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

ABELE, J., concurs as to assignment of error II and dissents as to assignment of error I.

HARSHA, J., concurs in judgment only as to assignment of error I and dissents as to assignment of error II.