[Cite as *Johnson v. Cleveland*, 194 Ohio App.3d 355, 2011-Ohio-2152.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95688**

**JOHNSON,**

APPELLEE,

v.

**CITY OF CLEVELAND ET AL.,**

APPELLANTS.

**JUDGMENT:**
REVERSED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-676734

**BEFORE:** S. Gallagher, J., Celebrezze, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** May 5, 2011

Friedman, Domiano & Smith Co., L.P.A., Jeffrey H. Friedman, David R. Grant, Donna Kolis, and Stephen S. Vanek, for appellees.

Robert J. Triozzi, Cleveland Director of Law, L. Stewart Hastings, Chief Assistant Director of Law, and William F. Gibson and Ami J. Patel, Assistant Directors of Law, for appellant.

SEAN C. GALLAGHER, Judge.

{¶ 1} Defendants-appellants the city of Cleveland, Shanna Stosak, Tracy McArthur, and Renee O'Neill appeal the decision of the Cuyahoga County Court of Common Pleas that denied their motion for summary judgment, which asserted political-subdivision immunity. Plaintiff-appellee Douglas Johnson filed a cross-appeal challenging the trial court's denial of a motion to strike. For the reasons stated herein, we reverse the decision of the trial court on the summary-judgment ruling and enter judgment in favor of defendants-appellants on all claims. We also overrule the challenge raised in the cross-appeal.

{¶ 2} On November 18, 2007, Johnson's girlfriend, Carine Gabriel, called 9-1-1 after Johnson smoked a cigarette laced with PCP. The call was categorized as an overdose/poisoning/ingestion. Gabriel and Johnson were located at a two-story residential building at 241 East 156th Street in Cleveland.

{¶ 3} Stosak and McArthur are employed as emergency medical technicians ("EMTs") with the Division of Emergency Medical Services ("EMS") for the city of

Cleveland. McArthur, an EMT-basic, and Stosak, an EMT-paramedic, were in the responding EMS unit. The police were also dispatched to the scene.

{¶ 4} When the EMS unit arrived, Gabriel informed the EMTs that Johnson had accidentally smoked PCP and that he needed their help. She did not inform the EMTs of the amount of drugs Johnson had ingested. She told the EMTs that she did not know whether Johnson was violent or not. She later stated during her deposition that she had no reason to believe that Johnson was attempting to hurt himself.

{¶ 5} In the meantime, Johnson walked down the driveway in a normal manner. According to Stosak, Johnson stated in a clear voice that he did not call EMS, he seemed a little agitated that EMS was there, and he walked away. According to Gabriel, Johnson never spoke to the EMTs and he was "really quiet and just standing there one second and the next minute he was gone." Johnson recalled that an ambulance was there and that he walked down and turned around; however, he did not remember saying anything. The EMTs were unable to physically examine Johnson or obtain his vitals. After Johnson walked away, Stosak called to cancel the call for the Cleveland police.

{¶ 6} Stosak admitted that Johnson did not run away, that they knew where he went, and that they could have followed him and assessed him. However, Stosak's visual evaluation of Johnson did not cause her alarm because there were no signs of obvious distress or injury, he did not show any signs of wanting to be treated, and he appeared normal. Stosak did not find any reason to believe that the scene was unsafe,

and she found nothing to indicate that transport was necessary. According to McArthur, there was no indication that Johnson had an altered mental status.

{¶ 7} Gabriel then went to check on Johnson. She did not ask the EMTs to go inside. The EMTs continued to wait in the driveway.

{¶ 8} Gabriel found Johnson "just sitting on the bed like this in our room quiet." She does not remember exactly what she told the EMTs when she returned outside; however, she "might have told [Stosak] that [Johnson] was just sitting there." According to Stosak, Gabriel informed her that Johnson appeared to be calming down. Gabriel asked the EMTs to continue to wait and make sure Johnson was all right.

{¶ 9} The EMTs informed Gabriel that they could not continue to stand around waiting, but that if anything were to change to call back and they would transport Johnson. Stosak called her supervisor, Captain Renee O'Neill, and informed O'Neill that Johnson came outside, appeared fine, did not want to be seen, and went back in the house. Stosak also told O'Neill that Gabriel came back out of the house and told the EMTs that Johnson appeared to be calming down. Gabriel disputes that she made such a statement. Relying on the information provided and because the patient had gone back inside, O'Neill gave Stosak permission not to transport Johnson as a "refusal special circumstance" and approved the EMTs to go back into service. O'Neill states in her affidavit that she found "no reason to believe a plan for safety at the scene for [Johnson] or others was necessary."

{¶ 10} The EMTs were at the address for approximately 21 minutes before they left. There is no evidence that Johnson's condition worsened before they left. The EMS run report indicates that it was reported that Johnson took a hit of PCP by accident and started to act a little strange, that his girlfriend got scared and called 9-1-1, and that Johnson refused any help from EMS and walked away. An addendum was added to the report later the same date, indicating that Johnson's girlfriend had gone back into the house to check on him and reported that he "seem[ed] like he [was] calming down" and "she felt he would be okay." These statements are disputed by Gabriel.

{¶ 11} Gabriel proceeded to call Johnson's mother and one of his friends. Both indicated at deposition that when they spoke to Johnson on the phone, they were concerned. Gabriel stated that she told Johnson's mother that "he had smoked the PCP and that [Gabriel] called emergency and that he was calm now. And I didn't want her to worry so I told her it's going to be okay." Gabriel also stated that "he was calm. He was definitely calm and talking quietly."

{¶ 12} Approximately 11 minutes after EMS left the scene, they were called back to the same residence for a "psychiatric/suicide attempt." Johnson had jumped off a second-story porch and seriously injured himself. The EMS unit arrived quickly. Stosak and McArthur immobilized Johnson, assessed his vital signs, and transported him to Huron Road Hospital. Johnson was treated for fractures of multiple thoracic vertebrae, multiple rib fractures, and bilateral pneumothoraxes. He was permanently paralyzed from the waist down.

{¶ 13} Johnson filed this action against the city of Cleveland and EMS employees Stosak, McArthur, and O'Neill[1] (collectively, "the defendants"). After discovery was completed, the defendants filed a motion for summary judgment, seeking dismissal of all claims on immunity grounds. In opposing the motion, Johnson submitted deposition transcripts and two expert affidavits. The city filed a reply brief that included the affidavit of the defendants' expert witness. Johnson filed a motion to strike the affidavit and was granted leave to file a surreply brief. The trial court denied the motion to strike and denied the motion for summary judgment, finding that "there is an issue of fact as to whether the acts or alleged failure to act by defendants constitutes willful and wanton misconduct and whether such failures proximately caused [Johnson's] injuries." This appeal and cross-appeal followed.

{¶ 14} Initially, we recognize that this court's appellate jurisdiction is confined to reviews of final, appealable orders within the meaning of R.C. 2505.02. See Article IV, Section 3(B)(2), Ohio Constitution; R.C. 2505.03. The defendants' appeal challenges the trial court's denial of their motion for summary judgment, which asserted political-subdivision immunity. The Ohio Supreme Court has held that "[w]hen a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and is therefore a final, appealable order pursuant to R.C. 2744.02(C)." *Hubbell v. Xenia*, 115

---

[1] O'Neill was added as a defendant in the second amended complaint. We note that her name also appears in the record as Renee O'Neil.

Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, at syllabus. Therefore, we have jurisdiction to consider the defendants' appeal.

{¶ 15} Johnson's cross-appeal challenges the trial court's order denying his motion to strike defendants' expert affidavit. This ruling pertains to evidence submitted with the summary-judgment pleadings in support of the immunity claim. Furthermore, a decision by this court in favor of immunity would effectively deny any "meaningful review" of the issue. Because the ruling is inextricably intertwined with an appealable order and must be decided to ensure "meaningful review," we find that this court has jurisdiction to consider the cross-appeal. See *Huffman v. Pioneer Basement Water Proofing Co., Inc.*, Tuscarawas App. No. 2007 AP 08 0048, 2008-Ohio-7032 (trial court's order striking affidavit was a final, appealable order because it was part and parcel of the trial court's decision granting summary judgment).

{¶ 16} Defendants' first and second assignments of error provide as follows:

{¶ 17} "1: [The] trial court erred in denying immunity to all defendants under Ohio Revised Code Chapter 2744 and Ohio Revised Code 4765.49.

{¶ 18} "2: [The] trial court erred in finding that an issue of fact existed as to whether defendants' actions or alleged failure to act constituted willful and wanton misconduct."

{¶ 19} This court must conduct a de novo review of a trial court's decision overruling a motion for summary judgment in which a political subdivision or its employee seeks immunity. *Hubbell*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d

878, ¶ 21.  "If, after that review, only questions of law remain, the court of appeals may resolve the appeal.  If a genuine issue of material fact remains, the court of appeals can remand the case to the trial court for further development of the facts necessary to resolve the immunity issue."  Id.

{¶ 20} R.C. 4765.49 specifically grants immunity to emergency-service personnel and their municipal employers from tort claims based on their administration of emergency medical services "unless the services are administered in a manner that constitutes willful or wanton misconduct."  R.C. 4765.49(A) provides that "[a] first responder, emergency medical technician-basic, emergency medical technician-intermediate, or emergency medical technician-paramedic is not liable in damages in a civil action for injury, death, or loss to person or property resulting from the individual's administration of emergency medical services, unless the services are administered in a manner that constitutes willful or wanton misconduct."  Similarly, R.C. 4765.49(B) provides that a "political subdivision * * * that provides emergency medical services * * * is not liable in damages in a civil action for injury * * * arising out of any actions taken by a first responder, EMT-basic, EMT-I, or paramedic * * * unless the services are provided in a manner that constitutes willful or wanton misconduct."

{¶ 21} We also recognize that R.C. Chapter 2744 affords a general grant of immunity to political subdivisions.  R.C. 2744.02(A)(1) provides that political subdivisions generally are not liable in damages for injuries resulting from an act or omission of the political subdivision or an employee thereof in connection with a

"governmental function," which is defined under R.C. 2744.01(C)(2)(a) to include the provision or nonprovision of emergency medical, ambulance, and rescue services. R.C. 2744.02(B) sets forth specific exceptions to the general grant of immunity. The only relevant exception herein is R.C. 2744.02(B)(5), which provides that a political subdivision is liable "when civil liability is expressly imposed upon the political subdivision by a section of the Revised Code." As discussed above, liability is not imposed upon a political subdivision that provides emergency medical services or first responders pursuant to R.C. 4765.49, unless there is "willful or wanton misconduct."[2] When a plaintiff has not shown that a specific exception to immunity under R.C. 2744.02(B) applies, a court need not move on to consider the defenses and immunities provided under R.C. 2744.03. *Widen v. Pike Cty.*, 187 Ohio App.3d 510, 2010-Ohio-2169, 932 N.E.2d 929, ¶ 13.

{¶ 22} Thus, we must consider whether the evidence in this case, when viewed most strongly in Johnson's favor, reasonably supports a finding of willful and wanton misconduct. The Ohio Supreme Court has defined "willful" misconduct as "conduct involving an intent, purpose or design to injure" and "wanton" misconduct as "conduct where one ' "fails to exercise any care whatsoever toward those to whom he owes a duty

---

[2] As recognized in *Fuson v. Cincinnati* (1993), 91 Ohio App.3d 734, 633 N.E.2d 612: "Because R.C. 3303.21 [now codified under R.C. 4765.49] pertains specifically to emergency medical services and, further, limits the immunity of a political subdivision and its emergency employees to cases not involving willful and wanton misconduct, it is reconcilable with R.C. 2744.02(B), and we must, accordingly, address whether the evidence in this case reasonably supports a conclusion that the [defendants] engaged in willful and wanton misconduct."

of care, and [t]his failure occurs under circumstances in which there is a great probability that harm will result." ' " *Zivich v. Mentor Soccer Club, Inc*. (1998), 82 Ohio St.3d 367, 375, 696 N.E.2d 201, quoting *McKinney v. Hartz & Restle Realtors, Inc.* (1987), 31 Ohio St.3d 244, 246, 31 OBR 449, 510 N.E.2d 386, quoting *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 4 O.O.3d 243, 363 N.E.2d 367, syllabus. The standard for showing "wanton" misconduct is high and requires more than mere negligence. *Fabrey v. McDonald Village Police Dept*. (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31. The evidence must establish a disposition to perversity "under such conditions that the actor must be conscious that his conduct will in all probability result in injury." Id.

{¶ 23} In this case, the record demonstrates that the EMTs responded to the scene and were informed that Johnson had "accidentally" smoked PCP, but were not informed of the amount of drugs Johnson actually had ingested or of any violent behavior. Johnson did not call EMS, and no family members were present. Johnson walked down the driveway in a normal manner, did not show any signs of injury or distress or an altered mental status, and went back into the residence without providing the EMTs with an opportunity to physically examine him. The EMTs found no cause for alarm, no reason to believe the scene was unsafe, and no need to transport Johnson. Consistent therewith, the EMTs canceled the call to the police.

{¶ 24} The EMTs proceeded to wait in the driveway while Johnson's girlfriend went to check on him. Gabriel did not invite the EMTs into the residence, and she informed the EMTs that he was sitting quietly on his bed. She stated in her deposition that

she had no reason to believe that Johnson was attempting to hurt himself. There is no evidence that Johnson's condition worsened in the approximately 21 minutes that the EMTs were on the scene.

{¶ 25} Before leaving, the EMTs informed Gabriel that if anything changed, she should call back and they would transport Johnson. The EMTs called Captain O'Neill, who authorized the EMTs not to transport Johnson as a "refusal special circumstance" and approved them to go back into service. Upon returning to the scene on the second run, the EMTs immobilized Johnson, who had jumped from the second-story porch, and transported him to the hospital.

{¶ 26} We do not find, when construing the evidence most strongly in Johnson's favor, that reasonable minds could find that the actions of the emergency personnel rose to the level of willful or wanton misconduct. There have been several similar cases in which courts have found a lack of evidence to show willful or wanton misconduct. See *Wright v. Hamilton* (2001), 141 Ohio App.3d 296, 750 N.E.2d 1190 (record fell short of establishing willful or wanton misconduct when there was no evidence that paramedics were aware of any great probability of harm to a defendant who presented as feeling dizzy and not acting like herself and later suffered a stroke); *Denham v. New Carlisle* (2000), 138 Ohio App.3d 439, 741 N.E.2d 587 (failure to perform certain procedures and to transport person to the hospital was not willful or wanton misconduct when emergency personnel had no reason to believe that he suffered from anything other than severe intoxication); *Fuson*, 91 Ohio App.3d 734 (no willful or wanton misconduct when

emergency personnel failed to transport an individual with a head injury who later died). We cannot say that the record herein warrants a different result.

**{¶ 27}** The expert opinions submitted by Johnson discuss the failure of the EMS employees to follow protocol and to exercise the appropriate standard of care. While this may well have amounted to negligent conduct, it did not rise to the level of willful or wanton misconduct. The legal conclusions reached by the experts do not alter the outcome in this case. See *Mitchell v. Norwalk Area Health Serv.*, Huron App. No. H-05-002, 2005-Ohio-5261 (disregarding experts' legal conclusions of willful and wanton misconduct); *Denham*, 138 Ohio App.3d 439 (record did not support a claim of willful or wanton misconduct despite expert's legal conclusion).

**{¶ 28}** There is insufficient evidence that the EMS employees engaged in willful misconduct, involving an intent, purpose, or design to injure Johnson. Nor does the record demonstrate that they failed to exercise any care whatsoever to Johnson, and the circumstances do not evince that any special duty arose. The paramedics timely responded to the scene, visually assessed Johnson before he walked away, continued to wait on the scene without any cause for alarm, and informed Gabriel to call back if anything changed. Further, the record does not support a finding that the EMS employees should have been aware, under the circumstances, that there was any great probability that harm would result or that they perversely disregarded a known risk.

{¶ 29} There is no doubt that the resulting injury in this case was tragic. However, there is simply a lack of evidence from which reasonable minds could find willful and wanton misconduct by the EMS employees.

{¶ 30} Accordingly, we find that the defendants are entitled to immunity under R.C. 4765.49 and that none of the exceptions to the general grant of immunity under R.C. Chapter 2744 apply. The first and second assignments of error are sustained.

{¶ 31} Because of our disposition of the first two assignments of error, we need not address defendants' third and fourth assignments of error, which pertain to proximate cause of injury and plaintiff's expert opinions.[3] We sustain defendants' fifth assignment of error and find that the city is entitled to immunity on the claims of negligent hiring, retention, and supervision of EMS personnel pursuant to R.C. 2744.02(A) and that none of the enumerated exceptions under R.C. 2744.02(B) apply. Even if an exception were to apply, the defenses under R.C. 2744.03(A)(3) and (5) warrant immunity for such discretionary acts. See *Fuller v. Cuyahoga Metro. Hous. Auth.*, Cuyahoga App. No. 92270, 2009-Ohio-4716.

{¶ 32} In their sixth assignment of error, defendants assert that the trial court should have dismissed plaintiff's claim that the applicable immunity provisions are unconstitutional. The Ohio Supreme Court has upheld the constitutionality of R.C. Chapter 2744. See *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889

---

[3] We further note that the issue of proximate cause is independent of the immunity claim that is before us for review.

N.E.2d 505, ¶ 95; *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 653 N.E.2d 1186. At least one other court has rejected constitutional challenges to R.C. 4765.49. See *Dickman v. Elida Community Fire Co.* (2001), 141 Ohio App.3d 589, 592, 752 N.E.2d 339. Therefore, the constitutionality challenge does not defeat an award of summary judgment herein.

{¶ 33} Finally, we address Johnson's cross-appeal. In his sole assignment of error, Johnson argues that the trial court erred by denying his motion to strike the affidavit of defendants' expert, Dr. Jonathan Glauser, which was submitted with defendants' reply brief. Johnson was provided with Dr. Glauser's expert report during discovery, and his affidavit was consistent therewith. The trial court allowed Johnson an opportunity to respond with a surreply brief, and there has been no showing of prejudice. We conclude that the trial court did not abuse its discretion in denying Johnson's motion to strike. Even if the trial court had committed error in admitting and considering the affidavit, that error was harmless. Accordingly, we overrule Johnson's assignment of error.

Judgment reversed.

JONES, J., concurs.

CELEBREZZE, P.J., concurs in judgment only.